[Civ. No. 12160.   First Dist., Div. One.   Jan. 8, 1943.]

LA SOCIETE FRANCAISE DE BIENFAISANCE MUTU-
ELLE (a Corporation), Appellant, v. CALIFORNIA
EMPLOYMENT COMMISSION, Respondent.

P. A. Bergerot, A. P. Dessouslavy and E. P. Bergerot for Appellant.

Orrick, Dahlquist, Neff & Herrington, T. W. Dahlquist, Musick, Burrell & Pinney, Howard Burrell, Gibson, Dunn & Crutcher, E. H. Conley, Lloyd S. Ackerman, Joseph Scott, J. Howard Ziemann, Leon A. Clark, Roth & Brannen, Lester W. Roth, MacDonald, Wallace, Cashin & Arrington, W. Woodson Wallace and Kenneth W. Watters, Jr., as *amici curiae* on behalf of appellant.

Earl Warren, Attorney General, John J. Dailey, Deputy Attorney General, Maurice P. McCaffrey and Glenn V. Walls for Respondent.

WARD, J.—Plaintiff brought four actions to recover sums aggregating $36,045.84, paid under protest under the California Unemployment Insurance Act (Stats. 1935, ch. 352, p. 1226; Gen. Laws 1937, p. 4121, Act No. 8780d), as con-

tributions claimed by defendant to be due for the period from January 1, 1936, to March 31, 1940, and as interest thereon and delinquent penalties. These actions were consolidated for trial, and resulted in a judgment in defendant's favor for the entire amount prayed for in the several suits. Plaintiff has appealed from the judgment, and from an order denying its motion to vacate said judgment and to enter a different judgment. The record does not disclose the order.

Sections 37, 38 and 44 of the California Unemployment Act (Stats. 1935, p. 1226, *supra,* as amended) impose contributions on employers and their workers based upon rates paid and received for services performed in "employment." Section 7(g) of said statute excludes from the term "employment," services performed in the employ of a corporation organized and operated exclusively for charitable, scientific or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual.

Plaintiff contends that it is a corporation organized and operated exclusively for charitable purposes, and that no part of its net earnings inures to the benefit of any private shareholder or individual within the meaning of section 7(g) of the California Unemployment Insurance Act; that, since the provisions of said section 7(g) of the state act are adopted from the federal Social Security Act and other federal tax statutes, this court must look to "the general understanding throughout the country" for the construction of the terms employed in section 7(g); and that under such "general understanding," the appellant is *per se* a charitable institution.

The defendant contends on the other hand that the plaintiff is not a corporation organized and operated exclusively for charitable, scientific or educational purposes, and that its earnings, or a portion thereof, do inure to the benefit of private individuals, inasmuch as the members of plaintiff receive hospitalization and other medical treatment and care, on payment of rates far lower than those charged to nonmembers, which preferential treatment is made possible only because plaintiff derives a profit from its services so rendered to non-members.

Plaintiff was organized in the year 1851 as an unincorporated beneficial society, and in 1856 incorporated pursuant to and in accordance with chapter VIII of the Corporation

Act of 1850 (Stats. 1850, p. 373), with its principal place of business in the city and county of San Francisco. It has no capital stock, and is composed of private individuals or members who, in consideration of the payment of admission fees and monthly dues, are entitled to receive medical, hospital and other privileges and advantages provided for in its by-laws, which state that appellant "is founded on the basis of mutuality for the treatment of sick members." The advantages provided for are available only to members in good standing. The affairs of the corporation are managed by a board of fifteen directors, who are elected by the members annually and who serve without any fees, salaries or other compensation whatever.

Admission to membership is limited to persons of French birth, or descendents of French or speaking French, sound in mind and body and less than 50 years of age, but these requirements have not been applied with great strictness. Its membership is not limited in number and varies from time to time by reason of death or the admission of new members. An admission fee is charged which ranges from $25 upwards. Monthly dues are $1.75. Life memberships cost $1,500; however, one who has been a member for 15 years may acquire life membership for $1,000.

Since its original organization in 1851 plaintiff has grown until it now operates a large hospital in San Francisco, which not only cares for its members, but offers its services to the general public. Its equipment, services and facilities are adapted to the treatment of various kinds of human sickness and ailment, and its executive staff is required to formulate policies to provide a high and progressive standard of professional service and scientific work.

During the fiscal year ended February 29, 1940, 44% of the patient-days at the hospital were recorded for members; 24% for part-paying members, being those who received and paid for services and facilities in excess of those to which they were entitled as members; and 32% for full pay patients, or non-members.

The hospital operates a training school for nurses, and provides equipment and facilities for the training of internes who are under the supervision of competent physicians. Plaintiff also maintains an old peoples home for the care of its aged and feeble members, and a relief fund which is used

to pay the dues of widowed, orphaned or needy members. Plaintiff is an agency of the Community Chest of San Francisco and receives from this source a certain sum annually to compensate it for the cost of services rendered to patients sent by the Chest.

Since its incorporation, it has received, as gifts and bequests the sum of $351,853.74. Its gross annual income from all sources during the five fiscal years ended February 29, 1940, varied from $384,609.61 to $418,354.60 of which approximately 43% of the average annual gross income was from admission fees and dues; approximately 54% from hospital rates or charges; approximately 2% from miscellaneous sources such as rentals, interest and dividends, and approximately 1% from gifts, legacies and donations. The annual gross expenses for the same period have varied from $373,502.55 to $421,562.84. In the last four fiscal years plaintiff has operated at a total loss of $63,980.03, the loss, however, for the year ending February 29, 1940, was reduced to $1,825.93.

As found by the court, any profits, gains or net earnings accruing "from plaintiff's operations are devoted and applied to the better and more ample care of its members and for the furnishing to said members of said medical, hospital and other benefits and privileges prescribed and contemplated by said bylaws, and that such profits, gains and earnings are not in any form or manner distributed or paid to anyone as dividends or interest. . . . That the earnings of plaintiff arising from the furnishing of hospital and other facilities and services to individuals who are not members of plaintiff, at rates, fees or charges in excess of those applicable to members, inure to the benefit of plaintiff's members only in the sense that such earnings have been and are used to enable plaintiff, as hereinabove found, to give better and more ample and augmented service, privileges and benefits to plaintiff's members."

Some time in 1937, the plaintiff requested of the Commissioner of Internal Revenue a ruling as to whether plaintiff was liable for payment of the taxes imposed by the federal Social Security Act. In a letter dated July 14, 1937, the commissioner advised the plaintiff that it was exempt from the payment of such taxes for the reason that it came within the provisions of sections 811(b)(8) and 907(c)(7) of said Social Security Act (similar to section 7(g) of the state statute), and that it was also granted exemption from income

taxes under section 101(6) of the Revenue Act of 1936 (also similar to section 7(g)). In a letter dated February 24, 1939, the Commissioner of Internal Revenue advised plaintiff that its exemption from income tax under section 101(6) was revoked, but that it was entitled to exemption under section 101(8), relating to civic leagues and local associations of employees. In a letter dated April 3, 1939, the Commissioner of Internal Revenue revoked the exemption from social security taxes previously accorded the plaintiff. In subsequent letters to the plaintiff, the Commissioner of Internal Revenue has reaffirmed the opinion expressed in his letters of February 24 and April 3, 1939.

In response to a letter from plaintiff enclosing copy of the then ruling of the Department of Internal Revenue, defendant, by letter dated July 31, 1937, granted to plaintiff exemption under section 7(g) of the California Unemployment Insurance Act, noting therein that it was possible the ruling might be reversed in the future. On or about September 28, 1939, the defendant officially notified the plaintiff that the opinion of July 31, 1937, was revoked.

As the result of a demand by defendant for contributions claimed to be due from it to the unemployment fund for the period commencing January 1, 1936, and ending September 30, 1939, plaintiff paid to defendant sums aggregating $26,822.84. Each payment was made under written protest, which set forth the grounds of objection, including the fact that the question had been ruled upon by the Internal Revenue Department and the Department of Employment in their notifications of July 14th and July 31st, 1937, respectively. Thereafter, under the provisions of said act, and under similar protest and objection, it made further payments to defendants of $2,460.28, $4,213.67 and $2,549.05. It is for the recovery of the total of these payments that this consolidated action (four separate suits therefor having been commenced) is prosecuted. Some of the payments were made long after they became due by reason of the fact that the officials charged with the collection of these unemployment contributions had advised plaintiff that it was not liable therefor, and as to those, interest was added to the amounts demanded and paid under protest.

The facts appear to be undisputed. The findings follow practically the allegations of the complaint.

The plaintiff contends that a non-profit hospital is *ipso facto* a charitable organization. ■ The definition of charity originally, under a strict construction of the word, implies the giving of something, or the rendering of gratuitous service. However, by later usage and in common parlance its meaning is sometimes extended to embrace liberality and generosity by patrons or benefactors in conferring advantages of a social character other than the rendering of personal aid or the bestowal of alms. ■ If used in a statute or legal instrument, the word must be defined in conformity with the purpose or intention of the law makers or the parties to the instrument.

Appellant has presented an opening brief of nearly two hundred pages, interesting as a treatise, containing various definitions of "charity," "charitable hospital," etc., all supported by authority. There is, however, very little comment therein on the exact language of the California Unemployment Insurance Act (Stats. 1935, ch. 352, p. 1226) imposing compulsory contributions on employers and employees, excluding, however, certain types of service (§ 7) among which are "Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual." (§ 7(g).) ■ ■ The words "operated exclusively . . . for charitable purposes . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual" call for a construction in accordance with the narrower definition of charity above given and require that it be shown the hospital is operated for no other purpose than that of dispensing charity, one test of which is that a shareholder or private individual shall not participate directly or indirectly in its net earnings.

■ The distinction between a charitable and non-charitable institution has been well stated in the case of *Estate of Henderson*, 17 Cal.2d 853 [112 P.2d 605], in which case (pp. 859-860) the court said: "If a group of individuals agree to contribute equal amounts into a fund to be used for the benefit of all, such a group may well be said to be non-charitable in nature because each individual is providing only for his own welfare and does not intend to make a free

contribution toward the assistance of others. If an outsider, however, receiving no benefits from the organization, makes a gift to it, that gift may well be a charitable one if the members of the organization are sufficiently numerous and it is organized for a purpose beneficial to society such as providing for medical assistance to its members. Such a donor has the charitable purpose of assisting those members of a large group who become sick, without any benefit to himself, and the gift thus may be a charitable one.''

The question whether in a given case a hospital was a charitable institution has frequently arisen in tort actions. (*Armstrong* v. *Wallace*, 8 Cal.App.2d 429 [47 P.2d 740]; *Richie* v. *Long Beach Community Hospital Assn.*, 139 Cal. App. 688 [34 P.2d 771]; *Shane* v. *Hospital of the Good Samaritan*, 2 Cal.App.2d 334 [37 P.2d 1066].) See, also, *Silva* v. *Providence Hospital of Oakland*, 14 Cal.2d 762 [97 P.2d 798] and *England* v. *Hospital of the Good Samaritan*, 14 Cal.2d 791 [97 P.2d 813]. In all such cases, including those in which a governmental agency's right to tax hospitals arises, the articles of incorporation, the by-laws, the origin and development of a non-profit institution depending upon assets merely sufficient to continue maintenance, the rights of members or associates, the privileges of non-members, and the benefits to the public under certain circumstances, may be proper evidence to show the charitable or non-charitable character of the institution. An institution may be declared ''charitable'' for the purpose of a bequest or in a tort action, but ''non-charitable'' for the purpose of taxation.

The vital question on this appeal is, did any of appellant's net earnings inure ''to the benefit of any private shareholder or individual?'' (§ 7g.) The facts heretofore stated demonstrate that while no profits or dividends are distributed, nevertheless the net earnings of appellant arising from its hospital facilities, and services to ''non-members'' at rates in excess of those generally charged members inure to the benefit of the members in augmented service and privileges which would not be available to them but for the added ''outside'' sources. In other words, appellant is not ''exclusively'' a charitable organization.

We refrain from citing *Estate of Dol*, 182 Cal. 159 [187 P. 428], growing out of a bequest to a similar hospital, or

*Brown* v. *La Societe Francaise,* 138 Cal. 475 [71 P. 516] (involving the appellant hospital) as conclusive support of the contention that appellant is not a charitable institution, in view of the following language used in *Estate of Henderson, supra,* p. 859: "In Estate of Dol the question was squarely presented whether a bequest to a mutual benefit society organized to render medical aid to its members was charitable. The court, however, held on the basis of the Brown and Gorman cases that the bequest was not charitable because the organization itself was not a charitable one. It failed to consider in any way whether the gift was charitable in nature despite the status of the organization, overlooking the fact that the Brown and Gorman cases on which it relied were not at all concerned with the charitable nature of gifts." We further call attention to the present by-laws of appellant, which provide that it is "founded on the basis of mutuality for the treatment of sick members," and to the finding of the trial court that its benefits were available only to members "in good standing." This indicates that while appellant performs certain charitable functions, it is in fact an association for the mutual advantage of the members who have paid admission fees and continue to pay dues.

A case somewhat similar factually is *In re Farmers' Union Hospital Assn. of Elk City,* 190 Okla. 661 [126 P.2d 244], where, at page 246, the court said: "In speaking of private advantage as being a factor that precludes any organization from assuming the status of a charitable or benevolent institution, we mean private advantage to the organizers, and the supporters thereof. The fact that a profit is realized from the operation of a hospital does not condemn the scheme as non-charitable or non-benevolent. It is the use to which the profit is put that means much. In this case some of the profits is used to increase the facilities and some to the reduction of the cost to the members. This is a private advantage." "There is a wealth of these cases [theretofore cited], and a variety of schemes of organizations and methods of operation, and many are held exempt and others not. In all of them there is one factor the presence or absence of which means almost more than anything else in determining the issue. That is this: Are the doors of the hospital open to all, poor patients and pay patients alike? If the answer is yes, it is a charitable hospital and its property is entitled to the exemption from taxation provided; if the answer is

no, it is not a charitable hospital and is not entitled to the exemption."

In *Smith* v. *Reynolds*, 43 F.Supp. 510, 513, the court said: "There can be little question but that a voluntary association for the mutual benefit of its members may, without difficulty, be distinguished from a public charitable institution. These distinctions have been considered by the courts and text writers. [citing cases]" *Northwestern Municipal Assn.* v. *United States*, 99 F.2d 460; *Estate of Lubin*, 186 Cal. 326 [199 P. 15] and *Estate of Wirt*, 124 Cal.App. 7 [12 P.2d 95], relied upon by appellant are not directly in point. In each case the court was called upon to determine whether a bequest itself was a "charitable" one, not the character of the organization itself.

Appellant urges that "The Unemployment Reserves Act and the Federal Social Security Act were in course of enactment at the same time and were intended to be components of a national and unitary plan for unemployment relief. Hence, the provisions which are common to both, and which were adopted from earlier Federal fiscal statutes, should be given the *same* meaning, especially where their meaning had already become well established." In support of this contention, appellant argues that the history of the Social Security Act (Federal Internal Revenue Code, §§ 1426(b)(8) and 1607(c)(7)) conclusively establishes that Congress considered "hospitals not operated for profit" to be "charitable" institutions and that "charitable corporations" must have the same meaning in each state.

▆▆ It is true that many decisions may be found defining "charity" in a comprehensive and liberal manner, so that practically all institutions of social benefit may be included, but such liberal definition is not appropriate when the statute provides that the institution or corporation must be conducted "exclusively" for charity. *In re Mendelsohn*, 262 App.Div. 605 [31 N.Y.S.2d 435] contains some language upholding appellant's theory. An institution of exactly the same type as appellant, however, was not involved. In that case it was held that the hospital was operated exclusively as a non-profit organization. ▆▆ The true rule is that when people band together to purchase hospital care in the event of illness, it is a business venture rather than a charitable undertaking, and the beneficiaries thereof do not consider

the benefits received to be "charity." (*Hassett* v. *Associated Hospital Service Corp.*, 125 F.2d 611.)

Further, we are unable to agree with appellant as to the view, purpose and intent of Congress, that hospitals not operated for profit are charitable institutions. In the Hassett case, an action to recover taxes alleged to have been illegally collected under certain provisions of the Social Security Act on the ground that the corporation was operated exclusively for charitable purposes by reason of the fact that its earnings did not inure to the benefit of shareholders or individuals, the court (pp. 615-616) said: "That Congress did not intend organizations similar to the plaintiff to be considered corporations organized and operated exclusively for charitable purposes is borne out by an examination of the statutes. The section of the Social Security Act here involved is exactly the same as Section 101(6) of the Revenue Act of 1934, 26 U.S.C.A. Int. Rev. Code, sec. 101(6), dealing with exemptions from income taxation. The income tax law, however, differs from the social security law in one important respect. In addition to the exemption granted to corporations organized and operated exclusively for charitable purposes, it also grants exemptions to certain types of mutual savings banks; fraternal beneficial societies; cooperative building and loan associations and banks; cooperative cemetery companies; benevolent life insurance associations of a purely local character; mutual ditch and irrigation companies; mutual or cooperative telephone companies or like organizations; farmers' or other mutual hail, cyclone, casualty or fire insurance companies or associations; farmers', fruit growers' or like associations organized and operated on a cooperative basis; voluntary employees' beneficial associations providing for the payment of life, sick, accident or other benefits to the members of such associations or their dependents; and teachers' retirement fund associations. None of these specific exemptions is contained in the Social Security Act. The fact that Congress specifically mentioned these organizations, even though the statute contained the exemption granted to corporations' organized and operated exclusively for charitable purposes, would seem to indicate that Congress did not consider these organizations specifically mentioned to be within the scope of a charitable organization. Since the plaintiff closely resembles many of the organizations specifically exempted, Congress could not have intended

it to fall within the scope of a corporation organized and operated exclusively for charitable purposes.''

It is next suggested that the Legislature has declared a non-profit institution contracting to furnish—though not itself furnishing—hospital service to its members, to be a ''charitable institution.'' ▮ The charitable character of appellant is not here to be measured by Insurance Code, section 11493.5, nor by Probate Code sections 27 and 41 cited by appellant. It is not necessary to discuss these theoretical problems in view of the provision in the statute under consideration that the corporation fund or foundation must be operated ''exclusively'' for charity. No such provision is found in the foregoing sections. The only question to consider is the method of operation of appellant hospital. ▮ The findings are based upon reasonable inferences drawn from the evidence and on this point should be sustained. (*California Emp. Com.* v. *Betthesda Foundation,* 54 Cal.App.2d 348 [128 P.2d 874].)

We conclude that appellant is not a corporation operated exclusively for charitable purposes within the meaning of the state Unemployment Reserves Act, and that the act imposed on it liability for contributions on account of wages paid its employees unless the effect of section 44 of the act, as amended in 1939, was to relieve it of this liability by reason of the fact that its failure to make payment of contributions when due was in reliance on the commission's interpretation that wages paid by it were not subject to contributions. If it is held that the effect of the 1939 amendment was not to relieve appellant from liability, there is a further question as to whether in the absence of statutory relief the state is nevertheless estopped to demand the contributions from appellant on wages paid while there remained unrevoked the commission's interpretation that such wages were not subject to contributions.

The pertinent provisions added by amendment in 1939 to section 44 of the act are as follows: ''Each employer shall be liable for any and all contributions required to be made by his workers on account of wages paid to them by such employer regardless of whether or not such employer shall have made a deduction on account thereof from the workers' wages at the time such wages were paid; provided, however, that no employer shall be liable for contributions required

on behalf of himself or of any of his employees with respect to wages payable or paid, as the case may require, while there is in effect at the time such wages became payable or were paid (whichever time is the time for determining contribution liability) a rule or regulation or interpretation of the commission or of the department that such wages were not subject to contributions imposed by this section. As used in this act, except when the context clearly requires otherwise, the term 'contributions' shall include the contributions of workers pursuant to this section.

"The commission or the department may prescribe the extent, if any, to which any rule, regulation or interpretation issued or promulgated in accordance with the provisions of this act shall be applied without retroactive effect." (Stats. 1939, p. 2052-53.)

The above provision is derived from federal legislation. (Int. Rev. Code, § 3791; 42 Stats. 314, § 1314; 45 Stats. 874, § 605; 48 Stats. 757, § 505.) The provision of the Internal Revenue Code is as follows: "The Secretary, or the Commissioner with the approval of the Secretary, may prescribe the extent, if any, to which any ruling, regulation, or Treasury Decision, relating to the internal revenue laws, shall be applied without retroactive effect." (1 Paul and Mertens, Law of Federal Income Taxation, p. 16, § 1.25, p. 87, § 4.13; 48 Harv. L. Rev. 1304, 1308; 28 Columb. L. Rev. 570; see discussion Bertha G. Bamberger, 27 B.T.A. 785, rev. and rem. 67 F.2d 983.) In 1937 and 1939 provisions similar to that of the Internal Revenue Code were added to a number of our tax statutes. (Gift Tax Act, Stats. 1939, ch. 652, § 39; Personal Income Tax Act, Stats. 1937, p. 1861, § 34; Corporation Income Tax Act, Stats. 1939, ch. 1049, § 26; Bank and Corporation Franchise Tax Act, Stats. 1939, ch. 1050, § 22.1; Use Tax Act, Stats. 1937, p. 1943, § 21; Private Car Tax Act, Stats. 1939, ch. 680, § 24; Motor Vehicle Transp. License Tax Act, Stats. 1939, ch. 944, § 15; Use Fuel Tax Act, Stats. 1939, ch. 682, § 28; Motor Vehicle Fuel License Tax Act, Stats. 1939, ch. 705, § 12a.)

In the present case, as noted above, on July 14, 1937, the United States Commissioner of Internal Revenue wrote to appellant that its claim to exemption from payment of taxes imposed by the federal Social Security Act was allowed, that it came within the section of that act exempting corporations operated exclusively for charitable purposes. The letter also

informed appellant that it was exempt from income tax under analogous provisions of the statute imposing that tax.

On July 31, 1937, the Department of Employment of this state acknowledged receipt from appellant of a copy of the interpretive ruling of the federal Commission of Internal Revenue and notified appellant that it was granted exemption under section 7(g) of the state act. The letter concluded: "It is possible that this ruling may be reversed in the future. If so, you will be notified."

Prior to receiving these rulings appellant had made deductions from the wages paid its employees. Thereafter it paid over to its employees the amounts withheld and did not subsequently make deductions until notified of a change of ruling as to its status.

In 1939 both the federal and state authorities reversed their rulings. In a letter of February 24, 1939, the Bureau of Internal Revenue informed appellant that its status had been before the bureau for review and that it had been held that it was not entitled to exemption from the income tax under the charitable corporation exemption, but that it was entitled to exemption under section 101(8) of the Revenue Act of 1938, which applies to non-profit civic leagues or organizations operated exclusively for the promotion of social welfare. The letter stated that the status of appellant for social security tax purposes would be made the subject of a separate communication. On April 3, 1939, appellant was informed that it was liable for taxes imposed by the Social Security Act. Several months later, by letter of September 28, 1939, the state commission gave appellant official notification that its opinion of exemption expressed in the letter of July 31, 1937, was revoked.

On September 19, 1939, the amendments to section 44 of the state Unemployment Reserves Act became effective. The provisions are quoted above. The effect of the amendatory provisions, if valid, is in certain circumstances to relieve an employer from liability for the tax imposed by other provisions of the act. The feature which will relieve an employer from liability for contributions "required" by the act is that there has been in effect at the time the wages became payable or were paid "a rule or regulation or interpretation of the commission or of the department that such wages were not subject to contributions." But whether such a rul-

ing will have that result depends on subsequent action taken by the commission at the time it reverses its ruling. This follows from the concluding paragraph of the amendment. By that paragraph it is provided that "the commission or the department may prescribe the extent, if any, to which any rule, regulation or interpretation issued or promulgated in accordance with the provisions of this act shall be applied without retroactive effect."

Under this paragraph the commission may prescribe that a ruling by it shall operate without retroactive effect, that is, prospectively only. If it fails so to provide its ruling, by force of this statutory provision, must operate retroactively as well as prospectively. That is, where the commission first rules, contrary to the statute, that no tax is due and thereafter corrects its ruling, the taxpayer must pay the taxes to the extent recovery is not barred by the statute of limitations unless the subsequent correct ruling affirmatively provides that it shall be applied without retroactive effect. In the present case the later ruling failed to provide that it should be without retroactive effect.

The commission or department merely interprets the statute in the course of its administrative application. Since the statute has the same meaning from the time of its enactment, a correct interpretation must of necessity speak as of the effective date of the statute. The provisions we are here considering give the administrative authorities power to relieve a taxpayer from the consequences of this principle where it would be harsh and unfair to require him to pay taxes which he failed to pay when due in reliance on an administrative ruling. Under the express terms of the statute herein the taxpayer is not relieved from his obligation unless the commission or department prescribes that its ruling shall be without retroactive effect. This was not done in the present case.

In this analysis it is unnecessary to consider the validity of the amendatory provisions as against the contention that they confer judicial or legislative power on an administrative body in violation of the state Constitution. It is also unnecessary to consider the further problem whether the Legislature intended that the provisions should in any event operate retroactively to relieve the taxpayer from contributions which had become due and payable before the effective date of the amendments, or were designed to apply in the

future where the commission should rule thereafter that no tax was due, and subsequently issue a corrected ruling. In the event the provisions apply to taxes due and payable before their effective date, there is a further problem, not necessary to consider here, as to whether a gift of public moneys would thereby be made in violation of the state Constitution. (Cal. Const., art. IV, §§ 22, 25, subd. 16, § 31.)

There remains the question whether independent of the statutory provisions of 1939, which, as we have shown, do not protect plaintiff, the state is nevertheless estopped to collect the past due taxes, or any part thereof. The tax is made up of the employer's contribution, measured by a percentage of the wages of each employee, and the employees' contributions, likewise a percentage of individual wages. (Stats. 1935, pp. 1232, 1234; Stats. 1939, p. 2052.) The act provides that the employer shall withhold the amount of his workers' contributions from their wages and shall transmit all contributions to the unemployment fund. (§ 44.) If payments to the fund are not made when due, the employer is additionally liable for interest. (§ 45.) Since 1939 the act provides for a penalty where the employer "without good cause" fails to pay contributions, and for a heavier penalty where his failure is due to intentional fraud. (Stats. 1939, p. 2053, § 45.3.) No penalties were collected in the present case.

The plaintiff herein, as employer, made deductions from wages of its employees until receipt of the rulings from the federal and state authorities that it was not liable for the tax because operated exclusively for charitable purposes. Upon receiving these rulings plaintiff paid to its employees the amounts withheld, and it did not thereafter withhold any portion of its employees' salaries until receipt of the April 3, 1939, ruling from the federal commissioner that it was subject to tax under the federal Social Security Act. The payments of taxes made by plaintiff under protest on October 5, 1939, and thereafter, included both its contributions as employer and the amounts required as employees' contributions. As to the employees' contributions on wages paid before April 3, 1939, the payment was made entirely with its own funds, since it had long since turned over to its employees the amounts deducted from their wages. On February 19, 1940, the state demanded of plaintiff that it pay interest in the amount of

$4,213.67 on contributions due for the period January 1, 1936, through June 30, 1939, and plaintiff made payment under protest on February 28, 1940.

It seems plain that if the state is permitted to retain the amount which represents the employees' contributions, plaintiff as the employer will be without recourse against its employees to recover from them the amounts which it should have withheld from their wages, but which it failed to withhold in reliance on official rulings that it was not liable for the tax.   Section 44 as amended in 1937 provides: "Contributions by workers, payable to the commission as herein provided, shall be exempt from garnishment, attachment, execution or any other remedy for the collection of debts." (Stats. 1937, p. 2067.) As to such part of the tax, the burden of which the act contemplates will be borne by the employees, and which the employer "transmits" to the fund, we are of the view that the state may not belatedly hold the employer to payment where he has failed to pay, or to make the necessary deductions from his employees' wages, in reliance on an express ruling that he is not liable for the tax. As between the state and the employer, the state may not in good conscience thus place on the employer a burden which the act itself did not intend that he should bear. We are further of the view that the employer cannot be held to pay interest on contributions which were not paid when due solely in reliance on the official ruling of non-liability. On the other hand, the state should not lose its right to taxes which the employer should have paid from its own funds to discharge its own tax obligation. That is, the state is entitled to retain that portion of the tax collected under protest which represents the plaintiff's contribution as employer, notwithstanding plaintiff failed to make payment when due in reliance on the erroneous ruling of non-liability.

That there are situations where the taxpayer should not be penalized by being held to pay penalties, is given statutory recognition in Minnesota, where it is provided: "The commissioner shall have power to abate penalties when in his opinion their enforcement would be unjust and inequitable. The exercise of this power shall be subject to the approval of the attorney general." (Laws of Minnesota, 1941, p. 1168.) In a decision just rendered the Minnesota Supreme Court modified a decision of the district court by eliminating penalties from a judgment for recovery of a tax deficiency which

had not been paid when due in reliance on a former erroneous ruling which left no deficiency. (*In re Abbott's Estate*, Nov. 20, 1942, —— Minn. —— [6 N.W.2d 466].) The court itself eliminated the amount of penalties from the judgment, although the commissioner had not taken such action.

In *Waterbury Savings Bank* v. *Danaher*, 128 Conn. 78 [20 A.2d 455], involving taxes due under the Connecticut Unemployment Compensation Act, the court held that the state could collect from the employer no part of the contributions required to be made for the period from November 1, 1937, to March 30, 1939, where such contributions were not paid when due in reliance on an erroneous ruling of the Tax Administrator that the employer was a federal instrumentality. The court said, without extended discussion: "Where it appears that it is against public policy that an administrative officer should change a decision with retroactive effect, it is the court's right and duty to curb his powers so as to serve that policy." Under the Connecticut act no part of the contributions required was deductible from wages.

We are unable to go to this extent in our holding. The cases cited by the court involved rulings of a different type. In those cases the first regulation, upon which reliance was had, was not an erroneous interpretation of a statute, but a valid exercise of administrative power conferred by the statute. In the Connecticut case and in the present case the rulings are of a different type. It is the general rule that the government does not lose its revenues because of an erroneous ruling of an administrative official as to the meaning of a tax law. (*United States* v. *Tuthill Spring Co.*, 55 F.2d 415; *Darling* v. *Commissioner of Int. Rev.*, 49 F.2d 111; *Champ Spring Co.* v. *United States*, 47 F.2d 1; *McIlhenny* v. *Commissioner Int. Rev.*, 39 F.2d 356; *United States* v. *Bartron*, 35 F.2d 765; *United States* v. *Kelley*, 24 F.2d 234; *United States* v. *Standard Spring Mfg. Co.*, 23 F.2d 495; *Langstaff* v. *Lucas*, 9 F.2d 691; 49 Yale L. J., 1264.) An administrative regulation which is in conflict with the statute is invalid and the government is not bound thereby. (*Intercoast Trading Co.* v. *McLaughlin*, 18 F.Supp. 149; *Fresno Grape Products Corp.* v. *United States*, 11 F.Supp. 55.) The duty of the tax officials is to collect taxes imposed by law. ▮ Accordingly, unless recovery is barred by the statute of limitations it is generally no defense that taxes were

not paid when due in reliance on an official ruling of non-liability. The taxpayer is deemed to act with knowledge that administrative officials cannot bind the government by their erroneous interpretation of tax statutes. Even where the government has made a refund to the taxpayer on an interpretive ruling that no tax is due it is held that it may subsequently recover the amount erroneously refunded. (*St. Louis Union Tr. Co.* v. *United States*, 82 F.2d 61; *United States* v. *Tuthill Spring Co.*, *supra*; *Champ Spring Co.* v. *United States, supra; United States* v. *Bartron, supra; United States* v. *Standard Spring Mfg. Co.*, *supra*; contra; *United States* v. *Detroit Steel Products Co.*, 20 F.2d 675.)

Recent studies of the cases dealing with the effect of administrative rulings have expressed the view that as a matter of sound public policy there should be some amelioration of the harsh consequences of the principle that the government is not bound by erroneous rulings of officials administering the tax laws. Representative of this critical point of view is an article by Maguire and Zimet, *Hobson's Choice in Federal Taxation*, (1935) 48 Harv. L. Rev. 1281. The authors remark: "If we say with Mr. Justice Holmes, 'Men must turn square corners when they deal with the Government,' it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens." (P. 1299.) The authors find in the principles broadly laid down in the decisions "frequent manifestations of official irresponsibility." (P. 1308.)

The 1939 Supplement to Paul and Mertens, Law of Federal Income Taxation, refers to "the courts' double standard of moral attitude in looking the other way when government agents act inconsistently in safe-guarding the public revenues and in dealing severely with the taxpayers' slightest inconsistencies." (P. 2534; for discussion of estoppel against the government in tax matters, see pp. 2507-2536 of this supplement.) The discussion of estoppels against the government concludes: "There is certainly much to be said for a rule which will work both ways, but the development of such a rule is hardly to be expected, although we may find some increasing tendency to hold the Commissioner more strictly to account upon the basis of the same principles of estoppel which are now so frequently employed against the taxpayer." (P. 2536; see, also, 88 U. of Pa.L.Rev. 556; 54 Harv.L.Rev. 398.)

We have heretofore referred to the decision of the Supreme Court of Errors of Connecticut in *Waterbury Savings Bank* v. *Danaher,* 128 Conn. 78 [20 A.2d 455], where the state was held without right to collect unemployment taxes which had not been paid when due in reliance on an official ruling of non-liability. We have said that we are not in accord with that decision insofar as it would permit plaintiff herein to avoid liability for the full amount of the tax due from it. ▓▓▓▓ It is our view that in the present case a proper regard for the protection of the interests of the government in its revenues, with recognition also of a degree of responsibility on the part of the government to a taxpayer who has relied to his prejudice on an official ruling, is achieved by requiring the taxpayer to discharge that part of the tax burden which it was contemplated it should bear by the statute imposing the tax, while relieving it from liability for the employees' contributions and interest on delayed payments. The taxpayer will pay from its own funds as much as it would have paid originally but for the erroneous administrative ruling, but it will not pay more.

▓▓▓▓ In application of the views expressed above, appellant cannot justify reliance on the rulings of non-liability after receipt of the federal ruling of February 24, 1939, to the effect that its exemption from the income tax was no longer referable to the exemption of corporations operated exclusively for charitable purposes, but to a different provision. The letter stated that the plaintiff's status for social security tax purposes would be made the subject of a separate communication. In view of the similarity between the charitable exemption provision of the income tax law and that of the Social Security Act, appellant was bound to anticipate the ruling of non-exemption from the social security tax, which ruling followed by letter of April 3, 1939, and also was forewarned that the state would reverse its position. The state act follows the language of the federal statute and both together provide an integrated scheme of social security. The testimony is that plaintiff did in fact commence making deductions from wages paid in April, 1939, upon receiving the letter from the federal government.

The principle that estoppels will rarely be invoked against the government is not limited to the tax field. (19 Am.Jur. 818.) Accordingly, where it is found that the rule that es-

toppels will be raised against the government in exceptional cases is applied in such manner as nevertheless to leave the doctrine of exceptions with real vitality, there is reason for employing similar standards in application of the doctrine in tax matters. In this state an estoppel was raised against the city of Los Angeles in *Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d 309 [44 P.2d 547], *McGee* v. *City of Los Angeles,* 6 Cal.2d 390 [5 P.2d 925], and *City of Los Angeles* v. *County of Los Angeles,* 9 Cal.2d 624 [72 P.2d 138, 113 A.L.R. 370]. In the last of these cases the facts were that the Los Angeles Railway Corporation was required to pay a percentage of its gross receipts as consideration for its franchises. After annexation of certain territory to the city of Los Angeles the corporation should have made the payments to the city, rather than to the county, but it continued to pay the county. It was held that justice and equity required a holding that the rules of laches and estoppel barred the city from holding the railway corporation to pay a second time.

The judgment is reversed in part, with directions to the trial court to compute the portion of the taxes paid under protest, which represents the amount of employees' contributions for the period between January 1, 1936, and February 24, 1939, and to enter judgment for plaintiff for that amount, and for the sum of $4,213.67, paid by plaintiff under protest as interest on delayed payments. Insofar as the judgment denies the recovery of any part of the employers' contributions it is affirmed. Each party shall bear its own costs.

Peters, P. J., and Knight, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 8, 1943.