[L. A. No. 20298.   In Bank.   Nov. 1, 1948.]

NORTHROP AIRCRAFT, INC., Respondent, v. CALIFOR-
NIA EMPLOYMENT STABILIZATION COMMIS-
SION, Appellant.

Fred N. Howser, Attorney General, and Chas. W. Johnson, Deputy Attorney General, for Appellant.

O'Melveny & Myers, Louis W. Myers, Pierce Works and Maynard J. Toll for Respondent.

SHENK, J.—This is an appeal by the defendant commission from a judgment for the plaintiff in an action to recover the amount of an additional employer's tax for 1943 purportedly assessed pursuant to the Unemployment Insurance Act (formerly Unemployment Act, Stats. 1935, p. 1226, as amended, 3 Deering's Gen. Laws, Act 8780d), and paid by the plaintiff under protest. The controversy presents the question of the power of the commission to make the additional assessment.

The case was tried on stipulated facts which were adopted as the findings of the court. For an understanding of the relevancy of the facts, it is deemed necessary to review briefly some of the provisions of the act in effect at the time involved.

Section 1 declares the state policy underlying the legislative enactment for a compulsory accumulation of funds to be used for a system of unemployment insurance. Section 2 states that the enactment is part of a national plan of unemployment reserves and social security without which the state system is not to function.

"Employment" is service performed for wages or under a contract of hire. (§ 6.5.)

By section 9(a) "employer" means an employing unit which in each of 20 weeks of the current calendar year has four or more individuals in employment. An "employing

unit'' (§ 9(e)) is an individual or organization employing subsequent to January 1, 1936, one or more persons. Section 9.5 provides that an employing unit which becomes an employer subject to the act within any calendar year shall be subject to the act during the whole of that calendar year.

Section 37 requires contributions by every employer for each calendar year in which he is subject to the act. For the year 1938 and thereafter the rate of contribution is specified to be 2.70 per cent of all wages with respect to which contributions become due and payable for employment subject to the act (§ 38), but by section 39(c) after December 31, 1940, a minimum of 1 per cent may be contributed by an employer whose separate account (see §§ 40, 41) has been subject to benefit charges during the period of 12 complete consecutive calendar quarters ending on the computation date for the rating period and his net balance of reserve is 11 per cent or more of his average base payroll.

Section 41.1(a) requires the commission annually to furnish each employer with an itemized statement showing the charges and credits to his account, the net balance of his reserve, and his contribution rate for the next succeeding rating period. For our purposes the computation date is June 30th for the purpose of establishing the contribution rate for the next succeeding calendar year (§ 42(a)(4)) and the rating period is the full calendar year next succeeding that computation date (§ 42(b)(4)).

The plaintiff, Northrop Aircraft, Inc., was incorporated in this state on March 7, 1939. Prior to July 29, 1939, it had several unpaid officers, and one employed person to whom on August 1, 1939, it paid salary accrued for services rendered during the preceding May and June. Beginning on July 29, four officers and two additional employees were paid. These facts were communicated to the commission by letter, and on November 21, 1939, the plaintiff was advised that it qualified as a subject employer on December 16, 1939, and that it would be liable for contribution on total 1939 payrolls at the employer rate of 2.7 per cent. Therefore commencing not later than July 29, 1939, the plaintiff had in its employ one or more individuals performing services for wages (employing unit), and prior to December 17, 1939, had in employment four or more individuals performing services for wages in each of 20 different weeks during the calendar year 1939. The plaintiff remained a subject employer under the act.

On March 27, 1943, the plaintiff received a notice dated March 26, 1943, of employer's contribution rate for the rating period January 1, 1943, to December 31, 1943, showing the figures of charges, credits, average base payroll, and net balance of reserve, and ratio requiring a specified contribution rate of 1 per cent.

By section 41.1(b) of the act the employer had 60 days after the date of mailing of such notice within which to protest any of the items shown on the statement. No protest was filed by the plaintiff.

The plaintiff filed reports and made the contributions for the first three quarters of 1943 at the specified rate of 1 per cent. No further action was taken by the commission until December 29, 1943, when it issued an amended notice of employer's contribution rate for the calendar year 1943 specifying a change in ratio calling for an increase of the rate from 1 per cent to 2.7 per cent, and a notice dated December 28, 1943, of additional contributions totaling $312,896.62 due for the first three quarters. These notices were mailed to the plaintiff with an explanatory letter dated December 30, 1943, and were received by the plaintiff on January 3, 1944.

The plaintiff protested the foregoing action of the commission. Its protest and objections were argued but were ineffectual. On March 31, 1944, the plaintiff paid under protest the sum of $398,133.50, representing the excess of contributions for 1943 over the 1 per cent rate. This action for refund was filed within the 60-day limitation specified in section 45.10 of the act.

Neither the plaintiff nor the commission contest the accuracy of any of the items in the statements or notices of employer's contribution rate for 1943 except the items of ratio and rate of contribution. Nor is there any question of the qualification of the plaintiff for the 1 per cent rate for 1943 except in the matter of the initial date of employer subjectivity. The stipulation of facts conceded that the plaintiff became a subject employer and remained so after the initial date of subjectivity, but there was no agreement as to that date. On the agreed facts with reference to employment the trial court concluded that the correct opening date of subject status under the act was July 31, 1939. It was agreed, however, that all the facts bearing on the plaintiff's subject status were communicated to the commission prior to any related action by it. The court adopted the commission's view that

its first action in 1943 specifying the ratio calling for the 1 per cent contribution rate was erroneously based on the assumption that the plaintiff's reserve account had been subject to benefit charges during 12 complete consecutive calendar quarters ending on June 30, 1942 (the computation date for the 1943 rating period). Translated, this assertion means that the commission should have taken July 31, 1939, as the date of initial subject status, in which event the period preceding the computation date for the 1943 rating period would lack one month of comprising the required 12 complete consecutive quarters. In the explanatory letter of December 30, 1943, addressed to the plaintiff, the commission admitted that it had all the necessary information from which to find the correct opening date, which in September, 1939, was determined to be July 31, 1939. The commission in its letter ascribed the failure to use the latter date in specifying the 1943 contribution rate to the inadvertent omission of its accounting section to record the determined opening date in its indexes, whereupon the accounting section erroneously assumed that the organization date of March 7, 1939, was the date of initial subject status. The question remained and still remains a point of controversy, the plaintiff contending that facts of employment earlier than the asserted opening date and other provisions of the act, including section 9.5, determined its subject status as for the entire calendar year 1939, and that the trial court was in error in concluding that the correct opening date was July 31, 1939.

It becomes unnecessary to consider this point further, in view of our conclusion that the trial court correctly determined that the commission nevertheless exceeded its power in making the amendment affecting the plaintiff's contribution rate for 1943.

The plaintiff invokes section 41.1(b) of the act and the fact that it filed no protest of the statement dated March 26, 1943, fixing 1 per cent as the contribution rate for the current rating period. The statutory language relied on provides that unless the employer protests within the time prescribed, "such statement shall be conclusively presumed to be correct." There follows a proviso, subject however to section 41.1(c) as hereinafter shown, that the "commission upon its own initiative after notice to the employer and opportunity for him to protest may amend any statement if it subsequently finds any entries thereon to be incorrect."

The conclusive presumption of correctness in the absence of protest by the employer was undoubtedly provided for the purpose of concluding statements contained in the notice which might be adverse to the employer's interest, for example a statement which, if corrected, would decrease the rate. His opportunity for obtaining a correction of such matters was limited by the requirement for the filing of a protest within the time limited. On the other hand statements which, if uncorrected, might be deemed inimical to the interest of the unemployment relief system and fund maintained to sustain it, and which perforce must include the items of ratio and contribution rate, could be amended by the commission by acting under the proviso of that section. ■ But section 41.1(b), dealing with "Protest," must be read with the pertinent portion of section 41.1(c) dealing with amendments," which states: "An amendment by the Commission on its own initiative shall not affect the contribution rate for any rating period preceding the rating period during which such amendment was made but if such amendment results in a determination that a different contribution rate should have been computed for the current rating period the commission shall compute the proper contribution rate which rate shall be effective for the current rating period. Any additional contributions thus required to be paid shall be deemed to be due as contributions for the quarter in which the employer is notified of such determination." Read together the language of these subdivisions of section 41.1 discloses the legislative intent that the time within which the commission might make amendments on its own initiative affecting the contribution rate was not unlimited. The conclusion is inescapable that the power of the commission in that regard must be exercised at least during the rating period to be affected thereby, with notice and opportunity to be heard also within that period (which undeniably were not given), else no force could be accorded any purported change in the contribution rate. Here the asserted compliance with the requirements for notice and hearing would have effected a change in a subsequent period for a preceding rating period, which is expressly prohibited by the act. (Cf., *Wardall* v. *State of California*, 29 Cal.2d 639 [177 P.2d 270].) There is here no statutory authority for, but in fact a prohibition upon, the power of the commission to amend the contribution rate except as limited. That limitation on the power of the commission is operative under

the facts. (See *Kruszewski* v. *United States,* 163 F.2d 884.) That the Legislature desired finality of proceedings on the commission's initiative affecting the contribution rate within the rating period to be affected thereby, is reasonable as well as desirable, considering the factors of integration of the act with federal legislation, possible merit ratings under the Federal Revenue Code (26 U.S.C. §§ 1601, 1604), necessity otherwise of revising state and federal income tax reports, costs under war contracts, and other pertinent required audits and reports covering operations. But, regardless of the motivating reason, the language is plain and the intent clear, and neither may be judicially overridden by applying rules of construction applicable only in cases of doubtful meaning.

The commission nevertheless argues that it had no power to specify a contribution rate other than the rate prescribed by statute; that since the facts of the plaintiff's subject status required the 2.7 per cent rate for 1943, its first action was without authority under the law, therefore a nullity, and that its only authorized and valid action was that of December 29, 1943.

The difficulty with this position is that the commission in March, 1943, was acting in the performance of a duty imposed on it by the act, that is, as an administrative body to determine the facts to which the prescribed rates applied. As such administrative body it found the facts and specified the rate which it deemed applied thereto on the facts reported to it and which it could not thereafter change except in a protest proceeding without giving the employer notice and an opportunity to be heard before the close of the rating period to which the change applied.

For the commission to disclaim the performance of its duty as an authorized and valid action is to disregard the facts and the law applicable thereto. The act, as the foregoing provisions indicate, expressly vests in the commission the power and the duty to do what it did. In fact it may be open to question whether the December, 1943, notice received by the plaintiff in January, 1944, was in the performance of the duty to give notice of the contribution rate ''for the next succeeding rating period.'' But the plaintiff has not questioned that the March 26th statement was such notice. Furthermore the provisions of the act contemplated that the commission might make mistakes in the performance of its duty or in the exercise of its power to specify the applicable rate.

Therefore it was deemed that protection against unreasonably delayed revisions of the contribution rate was as much due to the employer when the commission took the initiative, as it was to the commission when the employer protested its action. A somewhat similar contention—that unauthorized payments of benefits under the act were beyond the scope of the commission's authority and not binding—was rejected in *Western etc. Lumber Co.* v. *California Emp. Com.*, 58 Cal.App.2d 403, 409 [137 P.2d 76]. ■ It is true, as the commission asserts, that it has power to reverse its rulings to accord with a correct application of the statute, but the timing of such reversals must accord with the statutory limitations. (*La Societe Francaise* v. *California Emp. Comp.*, 56 Cal.App.2d 534, 550, 553-554 [133 P.2d 47].) And as said in *Grand Central Public Market* v. *United States*, 22 F.Supp. 119, 131, the taxpayer on the one hand has a right to know that in the absence of fraud or deception on his part there is a definitely limited time within which the government may attempt to assess an additional tax, while the government on the other hand has the right to have a definitely limited time within which the taxpayer may successfully ask for a refund. Such limitations are binding on both the taxpayer and the government or taxing body. Several defenses, including estoppel, were rejected in *960 Park Ave. Co., Inc.* v. *Anderson*, 22 F.Supp. 138, where it appeared that the assessment of additional taxes was made after the statutory period had expired. Such provisions operate adversely to the commission's position and to support the conclusion of the trial court unless they are canceled by equitable considerations.

■ The commission places reliance on the general rule stated in such cases as *Philpott* v. *Superior Court*, 1 Cal.2d 512, 522, 523 [36 P.2d 635, 95 A.L.R. 990], and *Pollak* v. *Staunton*, 210 Cal. 656, 665 [293 P. 26] (citing authorities), and applied in tax refund cases (*Pacific Fruit Express Co.* v. *McColgan*, 67 Cal.App.2d 93, 96 [153 P.2d 607], citing *Stone* v. *White*, 301 U.S. 532 [57 S.Ct. 851, 81 L.Ed. 1265], and *Lewis* v. *Reynolds*, 284 U.S. 281 [52 S.Ct. 145, 76 L.Ed. 293]), to the effect that since a suit for a refund of taxes is in the nature of an action in assumpsit, the plaintiff may recover only if it be shown that more has been exacted than in equity and good conscience should have been paid. It may be assumed that such an equitable doctrine would govern in proper cases involving over or under payments of employer contributions

under the Unemployment Insurance Act. As suggested in *California Emp. Com.* v. *Black-Foxe Military Inst.*, 43 Cal. App.2d Supp. 868, at 872 [110 P.2d 729], the contributions may be regarded as a tax, but the broader aspects of the act—to ameliorate the hardships of unemployment and not strictly to raise revenue—require application of principles which will obtain enforcement of its provisions in accord with the legislative intent so long as constitutional rights are not invaded. However there are statutory and constitutional considerations here which prevent the application of the invoked doctrine. Neither that doctrine nor the cases relied upon preclude recovery of a tax collected pursuant to a barred assessment.

Isolated general statements of the doctrine are not necessarily indicative of the correct result in the particular case. For example, in *Lewis* v. *Reynolds, supra* (284 U.S. at p. 283) this statement is made: ''An overpayment must appear before refund is authorized. Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded.'' In that case the plaintiff had paid a deficiency which was duly assessed within the time limited, and then sought a refund of the amount paid on the ground of erroneous computation of tax due. But on a further recomputation made after the statute had barred further assessment, it was found that the plaintiff had in fact underpaid his tax. Obviously a refund of the previously paid deficiency duly assessed was denied because the plaintiff had not overpaid the tax due for the taxable year. The court expressly recognized that no new assessment could be made after the bar of the statute had intervened.

In cases such as *Stone* v. *White, supra* (301 U.S. 532), the government was permitted to retain money by way of equitable recoupment although the government's right to collect it was barred by statutory limitation.

On the other hand decisions such as *McEachern* v. *Rose,* 302 U.S. 56 [58 S.Ct. 84, 82 L.Ed. 46], indicate that pertinent statutory limitations will preclude the government's retention of an overpayment under the equitable doctrine of recoupment by crediting it against an unpaid tax whose collection has been barred by limitation. (See discussions and collections of the decisions on the subject in 109 A.L.R. 1362 et seq.;

130 A.L.R. 845 et seq.; *American Light & Traction Co.* v. *Harrison*, 142 F.2d 639, 154 A.L.R. 1042, and note at p. 1052.) However, there is no doctrine of recoupment or of permissible redetermination of the tax liability which will bestow power on the taxing body to make an assessment when the exercise of that power in respect to a particular tax has been terminated by statutory provision. To hold otherwise would be to amend or repeal the legislative enactment by judicial fiat. The distinction between the equitable doctrine and positive law was recognized in *Hartwell Mills* v. *Rose*, 61 F.2d 441, 443, and cases cited.

No principle or decision relied on denies to a taxpayer the right to resist a barred assessment by appropriate legal procedure, including suit for recovery after protested payment. None of the statements in the decisions may be read to the contrary. The equitable principle of recoupment which in some cases has permitted offsetting an overpayment in one year against a tax for another year the *collection* of which has been barred by the statute (*Stone* v. *White, supra,* 301 U.S. 532), or where the assessment was defective for technical irregularities (*Couts* v. *Cornell,* 147 Cal. 560 [82 P. 194, 109 Am.St.Rep. 168]; *Steele* v. *San Luis Obispo County,* 152 Cal. 785 [93 P. 1020]), does not interfere with our conclusion. Neither a barred assessment nor a statute of limitations was involved in *Pacific Fruit Express Co.* v. *McColgan, supra,* 67 Cal.App.2d 93. That case was concerned solely with a redetermination of the tax liability within the statutory time. Further review of the many decisions and authorities treating of the subject is unnecessary to demonstrate that this case is not one for the consideration of the asserted equitable principles but is ruled by the statutory limitations on the exercise of the commission's power to make an amendment affecting the contribution rate except after notice and opportunity for a hearing before the close of the rating period to which it relates. Failure to comply with the statute deprived the plaintiff of the due process thus provided and rendered the belated assessment a nullity.

Furthermore if it might be assumed that consideration could be given to the equities in this case, it would not follow that the judgment should be reversed. There was no concealment of any fact by the plaintiff; the defendant admittedly had possession of all the facts necessary to specify the alleged correct contribution rate and only through its own conduct

did it fail to do so. All of the factors which motivated the enactment of the provision for seasonable notice of the contribution rate bear upon the burdens which must devolve upon the plaintiff if the unseasonable amendment, through no fault of its own, should be upheld. True, the actual facts of employer subject status under the act were known to the plaintiff, but there was also present the question concerning the period during which its reserve account had been subject to benefit charges. This, and the factor of substantial, if not full technical qualification for the reduced rate, do not present a case wherein it may be said that the commission might conscionably retain the contributions in excess of the 1 per cent rate for 1943. Contentions similar to those advanced by the defendant were made in *Lyman* v. *United States*, 22 F.Supp. 14, where at page 15, it was said: ''It is argued that a retention of the money by the government would not result in its unjust enrichment, and, while this may be a true statement of fact, nevertheless, such retention would result in the beneficiary paying a tax which was not legally assessable against him . . . If either the beneficiary of the trust or the government is to suffer a loss, in good conscience and equity, that loss should be borne by the government, since its failure to assess a tax against the trust must be deemed to border on negligence, for it was acquainted with the set-up of the trust instrument.''

The judgment is affirmed.

Gibson, C. J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

EDMONDS, J.—As an incentive for continuous business operations and a minimum of labor turnover, the Unemployment Insurance Act of this state provides for a rate of contribution based upon the ratio of the employer's average base payroll to the amount of reserve which stands to his credit on the books of the commission. Otherwise stated, an employer who maintains continuous employment is required to make contributions to the fund at a lower rate than one who employs many workers for short periods of time. But to obtain this lower rate, an employer must have been subject to the requirements of the statute and chargeable for benefits throughout a three year period immediately preceding the computation date for the year for which the commission allows the credit to him. There is no authority in the law for assess-

ing any employer who has been subject to the requirements of the statute for less than three years at a rate below 2.7 per cent.

The primary question, therefore, in this case is whether Northrop was eligible for reduced contribution rates upon the basis of experience. Section 39(c) declares that the employer becomes eligible only after "12 complete consecutive" quarters of benefit experience, rather than merely being in business for 12 quarters prior to the computation date for the rating period, as Northrop seems to argue. The provision that the "reserve account of such employer shall have been subject to benefit charges" for the last 12 consecutive quarters means that eligibility for reduced contribution rates is restricted to a certain class of employers within the large class of contributing and covered employers. To be entitled to a rate lower than 2.7 per cent an employer must have been subject to the law and have had employment for at least three months and one day prior to the beginning of the three year experience period. Thus, for Northrop to have been eligible for an experience rate for the calendar year 1943, it must have been subject to the law and have had employment on or before March 31, 1939. In other words, the test fixed by the statute is based upon unemployment risk rather than contributions and coverage.

Assuming that Northrop became liable for the payment of contributions in the second quarter of 1939 (the earliest quarter for which it claims to have been covered), it was not eligible for a reduced rate in 1943 because under the terms of section 52.2 of the Unemployment Relief Act no claim for unemployment benefit could have been charged against its reserve fund until the fourth quarter of 1939. A claimant filing a valid claim for benefits during the second, or even the third, quarter of 1939, could not, in the computation of benefits utilize earnings from Northrop during either of those quarters of 1939. If he had filed a claim in the second quarter of 1939, his "base period" under section 52.2 would have been the "first four of the preceding five quarters," i.e., the four quarters of 1938. Since Northrop paid him no wages during 1938, no charge could have been made to its reserve account. The same result is reached as to a claim filed in the third quarter of 1939. The base period would then be the last three quarters of 1938 and the first quarter of 1939. But

Northrop admittedly made no payments of wages until the second quarter of 1939; therefore, the last quarter of 1939 is the first quarter in which there could have been a benefit charge to the reserve account of Northrop.

June 30, 1942, is the computation date for determining whether an employer is eligible for experience rating for 1943, the year here in question (Unemployment Relief Act, § 42), and in order to qualify therefor under the statute, Northrop's reserve account must have been subject to benefit charges for 12 consecutive quarters prior to that date, or before July 1, 1939. (§ 39.) Northrop lacks one quarter of qualifying for an experience rating for 1943; it is, therefore, not entitled to a contribution rate based upon its unemployment experience. Its rate under the statute, and regardless of any ruling by the commission, could not be less than 2.7 per cent.

However, Northrop claims that it is entitled to the experience rating because of the commission's notice of assessment at the rate of 1 per cent. It takes the position that because no protest was filed by it, the lower rate became fixed and was not subject to revision by the commission. But the controversy is not one which arises because the commission made an erroneous determination as to which of several rates the employer should pay, based upon his employment experience. In this case, the employer lacked the basic qualification for a lower rate than 2.7 per cent; he had not been subject to the statute for the three years necessary to give him the benefit of the employment experience rating. The commission's error was not in computation; it had no authority to make any concession whatever to Northrop because, at the time the 1 per cent rate was fixed, Northrop was not a business entitled to a determination by the commission as to which, of several different special rates it should pay. The error was not in calculation but in placing Northrop in the class of employers subject to special rating based upon a three year employment record.

As stated in the majority opinion, ''the Legislature desired finality of proceedings on the commission's initiative affecting the contribution rate within the rating period to be affected thereby.'' But the provisions of section 41.1 regarding the statement to be furnished annually by the commission to the employer are only with regard to the basis for the determination of the contribution rate where the employer is eligible for a contribution rate of less than 2.7 per cent.

Section 39 of the act must also be considered in this connection. It specifies the rates of contribution to be paid by employers, and fixes a percentage to be applied when the employer's net balance of reserve is a certain percentage of his average base payroll. The requirement of section 41.1 is that the commission annually must send a statement to each employer, showing his net balance of reserve, his average base payroll and the ratio of the latter to the former. If these figures are correct, in the normal case, the contribution rate is computed by dividing the net balance of reserve by the average base payroll. If the figures are not correct, they may be amended, at the instigation of either the employer or the commission, by following the procedure set out in that section, within certain time limits.

But section 39(c) of the act provides in part: "no employer *shall be considered eligible* for a contribution rate of less than 2.7 per cent for any subsequent rating period unless the reserve account of such employer shall have been subject to benefit charges during the period of 12 complete consecutive calendar quarters ending on the computation date for such rating period. . . ." [Emphasis added.] Such eligibility is a prerequisite to the benefit of reduced taxation based upon experience. The variation of the tax rates provided for by section 39 is based upon the past employment experience of the employer, and the method is known as "experience rating." (Arnold, *Experience Rating,* 55 Yale L.J. 218.)

Section 1602 of the Internal Revenue Code reads in part: "A taxpayer shall be allowed an additional credit under section 1601(b) with respect to any reduced rate of contributions permitted by a State law, *only* if the Board finds that under such law—(1) No reduced rate of contributions to a pooled fund or to a partially pooled account, is permitted to a person (or group of persons) having individuals in his (or their) employ except on the basis of his (or their) *experience with respect to unemployment or other factors bearing a direct relation to unemployment risk during not less than the three consecutive years immediately preceding the computation date;* . . ." [Emphasis added.] Obviously the Legislature, in providing the experience rating provisions of sections 39 and 41.1 intended those sections to conform to section 1602 of the Internal Revenue Code so that employers in this state may receive the benefit of reduced taxes on the basis of their experience rating.

But assuming that the majority opinion correctly interprets section 41.1, Northrop is not entitled to a judgment for the amount it paid. The court should apply the equitable doctrine approved in *Philpott* v. *Superior Court*, 1 Cal.2d 512 [36 P.2d 635, 95 A.L.R. 990], for Northrop would be unjustly enriched by recovering an amount for which it was justly liable. "The Statute of Limitations is to be employed as a shield, and not as a sword; as a means of defense, and not as a weapon of attack." (*Grant* v. *Burr*, 54 Cal. 298, 300.) If this action had been brought by the state to collect a tax, assuming a statute of limitations to be applicable, the rights of the parties would be quite different. But Northrop paid the tax and is suing for a refund; the state is not raising the statute of limitations as a bar to a recovery, for the suit is clearly brought in time. The situation here is as if "A" makes payment of a debt to "B" and then sues to recover the amount he paid, claiming he need not have paid it because a recovery was barred by the statute of limitations. "A" could not recover for the "statute is available only as a matter of defense, and cannot be set forth in an action in behalf of a debtor as conferring upon him a substantive right." (*Olinda Irrigated Lands Co.* v. *Yank*, 27 Cal.App.2d 56, 61 [80 P.2d 170].)

The claim that Northrop had no recourse but to pay the tax and save its rights by making payment under protest is not correct. Northrop could have withheld payment and defended a civil action brought to collect the contributions (§ 45; *California Emp. Stab. Com.* v. *Guernewood Park Resort & Tavern*, 70 Cal.App.2d 245 [160 P.2d 581]; *California Emp. Stab. Com.* v. *Smileage Co.*, 68 Cal.App.2d 249 [156 P.2d 454]) or contested a summary judgment for the recovery of contributions. (§ 45.9.) A matter of defense does not become a substantive right and, in my opinion, it was not the intention of the Legislature to place one who pays under protest in the same category as the state in an action to collect the tax, thus permitting that which is generally considered to be a matter of defense to become an affirmative right. The procedure of payment under protest is to prevent such a "delay [in] the creation of the fund as to frustrate the purposes of the act." (*Modern Barber Colleges* v. *California Emp. Stab. Com.*, 31 Cal.2d 720, 732 [192 P.2d 916].)

The rule in California, like that under federal statutes, should be that refunds are limited to overpayments. "It fol-

lows that the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. This involves a redetermination of the entire tax liability. While no new assessment can be made, after the bar of the statute has fallen, the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax. The action to recover on a claim for refund is in the nature of an action for money had and received, and it is incumbent upon the claimant to show that the [government] has money which belongs to him.'' (*Lewis* v. *Reynolds*, 284 U.S. 281, 283 [52 S.Ct. 145, 76 L.Ed. 293], quoting with approval from the opinion of the Circuit Court of Appeals in the same case, 48 F.2d 515, 516.)

But, assuming that the notice given under section 41.1 may include a determination of an employer's eligibility for an experience rating because of the time he has been subject to the provisions of the statute, ''it adds up to no more than that the Collector could not, by legal proceedings, have enforced the collection of the tax. It does not follow that the tax having been paid the taxpayer may demand its refund. No specific authority for such a proposition has been cited, and the absence of a general principle from which such a legal corollary can be derived is indicated by *Lewis* v. *Reynolds*, 1932, 284 U.S. 281, 283 [52 S.Ct. 145, 76 L.Ed. 293], where the court said: 'An overpayment must appear before refund is authorized. Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded.' '' (*Monjar* v. *Higgins*, 45 F.Supp. 303, 304.)

For these reasons I would reverse the judgment.