IOWA MOVERS & WAREHOUSEMEN'S ASSOCIATION, Appellant,

v.

Donald G. BRIGGS, Director of Iowa Department of Revenue, and Iowa Department of Revenue, Appellees.

No. 2–57422.

Supreme Court of Iowa.

Jan. 21, 1976.

Rehearing Denied March 12, 1976.

Donald A. Wine and Robert F. Holz, Jr., of Thoma, Schoenthal, Davis, Hockenberg & Wine, and Buck & Meade, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., George W. Murray, Sp. Asst. Atty. Gen., and Harry M. Griger, Asst. Atty. Gen., for appellees.

UHLENHOPP, Justice.

In this de novo appeal we consider problems in connection with the Iowa services tax and the Iowa income tax on foreign corporations, §§ 422.43, 422.33, Code 1975.

Plaintiff is an association of Iowa warehousemen. Plaintiff brought the present suit in equity for declaratory and injunctive relief against defendants Iowa Department of Revenue and its Director, whom we will call collectively the Department. In district court the suit involved several main issues: (1) the constitutionality of the application of the Iowa services tax to interstate warehousing activities, (2) estoppel of the Department to collect the services tax on such activities for a period in the past, (3) applicability of the tax to certain wrapping, packing, and packaging activities by warehousemen, (4) the constitutionality of the Iowa income tax on foreign corporations which would be exempt but for storing goods in Iowa, and (5) the standing of plaintiff to raise that fourth issue. The trial court found for the Department on all issues except the fourth, which it did not reach. Plaintiff appealed.

On this appeal, plaintiff abandoned its first issue, probably because of the 1947 decision of the United States Supreme Court in *Independent Warehouses, Inc. v. Scheele*, 331 U.S. 70, 67 S.Ct. 1062, 91 L.Ed. 1346 (tax upheld on warehousing goods under circumstances such as those here). Plaintiff also omitted its fourth issue, probably because of the trial court's ruling on the fifth issue. Plaintiff thus narrowed its appeal to the issues we have numbered (2), (3), and (5). Hence we proceed to the issues of estoppel, of wrapping, packing, and packaging, and of standing.

I. *Estoppel.* Iowa has had a sales tax and a complementary use tax for a number of years. In 1967 the General Assembly added as complementary to the sales tax a tax on the gross receipts from enumerated services, effective October 1 of that year. 62 G.A. ch. 348, §§ 20, 25. See Code 1975, §§ 422.42, 422.43 (part of the division on the sales tax). The act defined services broadly as acts performed within this state with respect to enumerated activities. Id. § 19(1) and (4). The enumeration included "storage warehouse and storage locker" and "warehouse" services, without stating that storage of interstate goods is exempt.

On September 30, 1967, the Iowa State Tax Commission promulgated services tax regulations. Regarding storage and warehouses the regulations stated, without any exception for interstate activities:

> 5.46(422) Storage warehouse and storage locker. Persons providing facilities for storing any type of personal property are rendering, furnishing, or performing a service the gross receipts from which are subject to tax. "Storage warehouses and storage lockers" shall include, but are not limited to, any facility provided for the purpose of storing household or building furnishings, foods, clothes, and furs, luggage, automobiles, airplanes, or any other tangible personal property. (See "Warehouses" Infra)

> 5.53(422) Warehouses. Persons engaged in the business of warehousing goods for others are rendering, furnishing, or performing a service the gross receipts from which are subject to tax. A "warehouse" is a building or place adapted to the reception and storage of goods and merchandise, and, in a more limited sense, is a building or place in which a warehouseman deposits the goods of others in the course of his business. 1971 I.D.R. 915–916.

The Tax Commission's regulations also covered administration of the services tax. The regulations stated that the rules governing the administration of the sales and use taxes apply to the administration of the services tax. 1971 I.D.R. 910. Those rules had long required that a taxpayer desiring an opinion or information make a written request stating all pertinent facts and include copies or abstracts of documents, and that a taxpayer desiring a formal ruling upon hearing before the Tax Commission make a written application therefor. Rules 1, 5, 1971 I.D.R. 839, 841.

The act also enumerated the service of advertising, without stating an exception for interstate activities. On September 28, 1967, broadcasters and newspaper publishers, and others allied with them, sued the Tax Commission claiming inter alia that the act violated the Commerce Clause in § 8 of Article I, United States Constitution. They showed, for example, that a newspaper published in Davenport, Iowa, circulated in both Iowa and Illinois, and that the signal of a Davenport radio station beamed into both states. The Tax Commission took the position that Iowa could tax the full advertising revenue because the paper was published in this state and the signal originated here. After trial in district court that case came to this court, which sustained the Tax Commission's position on November 12, 1968. *Lee Enterprises, Inc. v. Iowa State Tax Comm'n*, 162 N.W.2d 730 (Iowa). The plaintiffs in that case petitioned the United States Supreme Court for a writ of certiorari but dismissed their petition after the Iowa legislature repealed the tax on advertising altogether. 63 G.A. ch. 248, § 1. That case was litigated in the courts at the time of the events in the present case and plaintiff's executive secretary, Frank Burns, was aware of it. The Tax Commission's position in that case has a bearing on the parties' conduct here.

The first part of plaintiff's appeal is largely factual. We must thus deal with considerable evidence. We give weight to the trial court's findings but are not bound by them. Rule 344(f)(7), Rules of Civil Procedure.

Operators of Iowa warehouses hoped that storage in Iowa of interstate goods, that is, goods which had come into Iowa from other states or which were destined to leave Iowa, might be exempted under the Commerce Clause. They became active regarding that question, forming a committee to look into it and retaining an attorney to obtain a Tax Commission ruling on it.

Ernest Primmer, manager of a warehouse in Davenport, Iowa, testified that on October 3, 1967, he telephoned Earl Burrows, then chairman of the Tax Commission (predecessor of the Iowa Department of Revenue), to obtain some advice on the matter. Plaintiff offered as evidence of this call a telephone bill showing that on October 3, 1967, a long-distance call was made from Primmer's warehouse to the number of the Tax Commission in Des Moines. Plaintiff also offered some handwritten notes Primmer allegedly made during the call. Those notes stated among other things, "No official Ruling for Tax Commission" and "Unofficial Ruling."

Primmer testified he explained to Burrows that part of his warehouse business involved the storage of merchandise shipped on consignment by a manufacturer or distributor and held in his warehouse until removal lot by lot to fill local orders. Primmer said Burrows indicated that the charge for storage of any goods which came into Iowa from another state would be exempt from the services tax, whether the goods were delivered from the warehouse to someone in Iowa or to someone in another state. Primmer also said he asked Burrows about application of the tax to stored goods which originated in Iowa but were ultimately delivered outside the state, and Burrows responded he did not know the answer to that question and gave the telephone to a person in his office named Bracewell, who he said was an attorney. Primmer testified Bracewell indicated that the receipts from storage of goods destined to leave Iowa were also exempt.

In a deposition read into evidence at trial, Earl Burrows said he did not recall the conversation with Primmer, although it could have taken place. He did indicate in his deposition that in 1967 he had felt warehouse storage charges on goods destined to leave Iowa were exempt from the tax. Mr. Harold Bracewell, who was an attorney for the Tax Commission in October 1967, testified that he did not recall the conversation which Primmer related. He also testified he definitely knew he was not in October 1967 advising anyone on the services tax.

The Iowa Department of Revenue replaced the Tax Commission on January 1, 1968. William Forst was director of the Department and Burrows was his deputy. In February 1968, Burns and a warehouseman named Little took Forst and other tax officials on a tour of a Des Moines warehouse in an attempt to increase understanding of the business. Forst testified by deposition, "There was one thing I know, that when we left them we did not make any statement to them that their gross receipts from the performance of those services on tangible personal property moving in interstate commerce were exempt." In its brief plaintiff states that "the warehousemen do not claim that any specific advice on the taxation questions was given by Mr. Forst at [the warehouse tour]. The warehouse tour was informational."

Some confusion exists regarding the people who were present on this tour. Earl Burrows testified that he went on a tour of some warehouses; he thought this occurred in 1967. But he appeared to have a poor recollection of the tour; he was unable to recall which warehouses were toured or what other officials were with him, although he indicated he did not think Forst was along. Burrows testified that Forst went on some subsequent warehouse tours which he did not attend. Forst testified, however, that Burrows "may have been" on the February 1968 tour. Warehouseman Frank Burns seemed to have the clearest recollection of the tour. He said that the tour took place in February 1968, and that

he, warehouseman Little, Forst, Burrows, and a tax official named Sheldahl were present. He said of Burrows' presence on the tour, "I remember him very well." We conclude that the tour Burrows referred to in his testimony did take place in February 1968. Burrows testified that on this tour he discussed the interstate commerce question and may have indicated his understanding that the tax would not apply to storage of goods destined out of state.

In April 1968, the warehousemen received from their attorney a written opinion that the services tax did not apply to storage of goods coming into Iowa from out of state or originating in Iowa and destined out of state. The attorney did not testify at the trial and the source of his information does not appear.

Burns and warehouseman Dickinson testified that about February 1969 they met with Forst to discuss the services tax on interstate goods. They further testified they told Forst that since October 1967 they had collected the services tax only on goods originating and ultimately delivered in Iowa, and they asked him whether they should seek in the then session of the General Assembly a legislative exemption on storage of interstate goods. They stated that Forst told them they had no problem and need not seek a legislative exemption. Interestingly, however, in that 1969 session the General Assembly did amend the definition of services to exclude services performed on tangible personal property "delivered into interstate commerce . . .." 63 G.A. ch. 247, § 2. This amendment became effective May 8, 1969. Since that date, therefore, storage in Iowa of goods destined out of state has been exempt from the tax.

Although Forst said there seemed to him to have been two meetings between the warehousemen and himself, he could not specifically recall a meeting with Burns and Dickinson in 1969. He nonetheless indicated clearly that he did not tell the warehousemen, at that meeting or any other,

the storage charge on interstate goods was tax exempt. At one point in Forst's testimony, the following exchange took place between him and an attorney for the Department, Mr. Harry M. Griger:

Mr. Forst. And the other items [of plaintiff's petition], that I expressed to them or explained to them that warehouse services performed on goods moving into or out of the State of Iowa in interstate commerce were exempt from the application of the sales tax but that local warehouse services performed on goods not moving into interstate commerce were subject to the sales tax, I would have to say I did not make that statement.

Mr. Griger. You did not make that statement?

Mr. Forst. No, I did not make that statement.

Mr. Griger. In other words, did you ever make that statement orally to any warehouseman or his representative?

Mr. Forst. No. It's a statement that would not have been made orally. It's a formal position that would have been taken, and we obviously would have made that quite formal.

At another point Forst testified, "I don't recall just how many times [he met with the warehousemen]—it may have been only once. It could have been as many as twice. I'm quite certain that we did not give them any policy as to whether these were taxable in our opinion, or in my opinion because that's what it was."

Although Burns and Dickinson both said Everett Sheldahl, another tax official, was at the spring 1969 meeting, Sheldahl stated in a deposition that he could not recall any meeting with the warehousemen other than the February 1968 tour.

On August 18, 1970, after an audit, the Department assessed taxes against Cedar Rapids Transfer & Storage Company, a warehouser. The assessment included tax upon storage of goods which came into Iowa from other states.

On January 28, 1972, the Department issued a Sales and Use Tax Bulletin which included the following:

Listed below are seven items connected with services performed by warehouses with an explanation of each item and the Department of Revenue's position relating to their taxability:

1. Storage on goods that are received either intrastate or interstate by an Iowa warehouse and after storage are delivered within the state— Taxable since October 1, 1967.

2. Storage on goods that are received either intrastate or interstate by an Iowa warehouse and after storage are delivered into interstate commerce—Taxable October 1, 1967 to May 8, 1969; exempt after May 8, 1969.

Plaintiff brought this suit on April 26, 1972. In the part of the suit involved at this point, plaintiff asserts that notwithstanding the services tax statute, the Department is estopped from collecting the services tax on interstate warehousing antedating January 28, 1972, because of the Burrows, Bracewell, and Forst representations. The rule is that "the burden to prove and establish estoppel is on the party asserting it, with strict proof of all the elements being demanded." *Paveglio v. Firestone Tire & Rubber Co.*, 167 N.W.2d 636, 639 (Iowa).

Plaintiff first relies on the alleged statements by Earl Burrows and Harold Bracewell to Ernest Primmer in the telephone conversation of October 3, 1967, and on the representations on the interstate commerce question which may have been made by Burrows on his warehouse tour with Forst and others in February 1968.

As to the alleged Bracewell representations, our examination of the record persuades us Mr. Bracewell is a credible witness and his testimony that he was not advising anyone on the services tax is true.

As to Burrows, the trial court found only, "There is evidence that one tax commissioner, Earl Burrows, Jr., felt that transactions [where stored goods were destined out of state] were not subject to the Iowa sales tax." This finding is supported by evidence that Burrows probably did indicate to Primmer in the telephone conversation and perhaps indicated his understanding on the warehouse tour that storage of such goods was exempt. The question then becomes, is this a sufficient basis to hold the Department estopped from collecting the tax from Iowa warehousemen for the period prior to January 28, 1972?

This court stated in a sales tax case, *S & M Finance Co. v. Iowa State Tax Comm'n*, 162 N.W.2d 505, 510 (Iowa):

> Equitable estoppel is based on the idea that one who has made certain representations should not thereafter be permitted to change his position to the prejudice of one who has relied thereon. It is resorted to when otherwise manifest injustice would result. *Sanborn v. Maryland Casualty Co.*, 255 Iowa 1319, 1327, 125 N.W.2d 758, 763, and citations; 28 Am. Jur.2d Estoppel and Waiver, section 27, page 627, section 28, page 629. It is not generally invoked against the state, particularly when the collection of revenue is involved. 28 Am.Jur.2d, Estoppel and Waiver, section 122, page 783, section 123, page 783, 31 C.J.S. Estoppel § 138, page 675, § 140, page 690, § 147, page 730; Annotations, 1 A.L.R.2d 344.

As this quotation indicates, many cases can be found which state generally that the doctrine of equitable estoppel will not be applied against a state where, as here, the public revenue is involved; the *legislature* imposes the tax and only the legislature can grant exemptions. E. g. *People v. Illinois Women's Athletic Club*, 360 Ill. 577, 579–580, 196 N.E. 881, 882; *Comptroller of the Treasury v. Atlas General Industries*, 234 Md. 77, 84, 198 A.2d 86, 90. Several courts have concluded, however, that an exception to this rule should be made when the tax involved is a sales tax, a services tax as in this case, or a similar tax which is collected by the taxpayer from customers or others. See § 422.49, Code 1975.

In a California case an employer, relying on a commission ruling that it need not withhold tax from its employees, refunded to the employees amounts previously withheld. The commission later changed the ruling. The court held the state was estopped to collect from the employer the amount of the tax refunded to the employees but not estopped from collecting the employer's matching contribution to the tax fund. The court said that "the state may not in good conscience thus place on the employer a burden which the act itself did not intend that he should bear." *La Societe Francaise De Bienfaisance Mutuelle v. California Employment Comm'n*, 56 Cal.App.2d 534, 552, 133 P.2d 47, 56. In a sales tax case a California court stated, "If the taxpayer is a mere collection agency the state may be estopped, but not where the tax is imposed on the complaining taxpayer." *Market Street Ry. v. California State Board of Equalization*, 137 Cal.App.2d 87, 103, 290 P.2d 20, 30. See also *Crane Co. v. Arizona State Tax Comm'n*, 63 Ariz. 426, 163 P.2d 656; *Hoffman v. City of Syracuse*, 2 N.Y.2d 484, 161 N.Y.S.2d 111, 141 N.E.2d 605; cf. *Schuster v. Commissioner of Internal Revenue*, 312 F.2d 311 (9 Cir.).

On the other hand, some courts refuse to apply estoppel to sales tax cases even though the result is to make the seller himself pay a tax which, but for incorrect advice, he would have collected from buyers—tax administrators cannot change the tax statute which the legislature has enacted. See *State v. Maddox Tractor & Equipment Co.*, 260 Ala. 136, 69 So.2d 426; *Bennetts, Inc. v. Carpenter*, 111 Colo. 63, 137 P.2d 780; *Claiborne Sales Co., Inc. v. Collector of Revenue*, 233 La. 1061, 99 So.2d 345; *Henderson v. Gill*, 229 N.C. 313, 49 S.E.2d 754.

In the *S & M Finance Co.* case, this court noted the existence of cases which apply estoppel where "a later determination of

tax liability which contradicts a previous opinion compels the taxpayer to pay from his own funds a tax he could have collected from others except for the erroneous representation." The court did not decide, however, whether estoppel might be applicable against the state in tax matters "because the facts [in S & M] would not warrant such a result under any of the authorities." 162 N.W.2d at 510.

■ We reach a similar conclusion in this case. The statute passed by the legislature taxed warehousing and did not state that interstate warehousing was exempt. The regulations adopted by the Tax Commission at the inception stated that warehousing was taxable and stated no exception for interstate warehousing. The Tax Commission-Department regulations at all times set forth the way to obtain rulings from the Commission and the Department. Had plaintiff's attorney by written request or application secured a ruling that storage of interstate goods is not taxable, had he accordingly advised plaintiff of nontaxability, had plaintiff passed that information on to its members, had the members in reliance not collected the tax, and had the Department then changed its ruling retrospectively, we would have a situation comparable to the California cases and would be obliged to decide whether to follow them or the decisions going the other way. But for reasons of their own plaintiff and its attorney did not see fit to obtain such a ruling. Assuming arguendo that the doctrine of estoppel applies against the state in services tax cases, the Department is not estopped on the present facts.

■ Estoppel applies only when the party asserting it actually relied upon the alleged representations. *S & M Finance Co. v. Iowa State Tax Comm'n*, supra, 162 N.W.2d at 510. As to the Burrows-Primmer conversation of October 3, 1967, the Department would not be estopped in any event unless plaintiff's members relied on what Burrows told Primmer in the conversation.

Although Primmer testified he told Burns about the conversation with Burrows, we find no evidence in the record that any warehouseman other than Primmer relied on what Burrows told Primmer. Indeed on October 2, 1967, before the conversation or any other alleged representation, Burns told Primmer he felt, for undisclosed reasons, that the tax applied to intrastate storage only. Primmer testified that shortly after he talked to Burrows on October 3 he called Frank Burns again and told him what Burrows had said. Burns apparently was not surprised to hear this; Primmer said Burns "may have told me that this pretty much dovetailed with what an attorney he had out there was doing . . . ." It seems clear from this and Burns' statement in the October 2 conversation with Primmer that Burns felt in the first days of October 1967 that storage charges on interstate goods were exempt—probably on the basis of what he was told by plaintiff's attorney and quite apart from anything he was told by Primmer.

Moreover, we find no substantial evidence in the record that Burns relayed to plaintiff's members what Primmer told him; although Burns testified at the trial, he was not asked and did not say anything about this second conversation with Primmer. We see no basis for inferring that the plaintiff's members were ever told anything as a result of the Burns-Primmer conversation. We think, rather, that the warehousemen relied and acted upon their attorney's opinion, and not on the Burrows-Primmer conversation.

As early as October 2, 1967, plaintiff's attorney had apparently told Burns orally that the charge on interstate goods was exempt from the tax. Burns testified that he also received a written opinion from the attorney, in April 1968. The opinion said that "there will be no taxes upon the gross receipts of the following: Goods in interstate commerce, . . . 'in-transit' goods, and those goods originating within the state that have bills of lading designat-

ing out-of-state designations." Burns testified he had copies made of the opinion and sent to all plaintiff's members. He further testified he told Forst at the 1969 meeting that "our membership was collecting 3 per cent service tax *based on the interpretation that we had mailed out to them.*" (Italics added.) The only interpretation which the record shows had been mailed at that time was the opinion of plaintiff's own attorney. Also, Ernest Primmer testified that when he heard Cedar Rapids Transfer and Storage Company had been assessed back taxes for storage of interstate goods he responded, " 'How could anything like that happen when we have been following the guidelines that have come from several sources;' in *my* particular case, right from a phone call to the office of the Commission, *and in the other cases through the association, through apparently an attorney named Mr. Wasker* [plaintiff's attorney] . . .." (Italics added.)

Furthermore, this is not a case in which a lone mechanic telephones the Tax Commission to inquire whether the services tax applies to his work. That a small operator might seek advice in such manner is not improbable. Here however we have substantial businessmen joined together in a state association. They form a committee to obtain information. They retain legal counsel to get a ruling on the applicability of the tax. The Tax Commission rules prescribe a procedure to get a ruling. The question the warehousemen have—application of the tax to interstate activities—is one involving thousands of dollars of tax throughout the state. Their counsel informs them that storage of interstate goods is not taxable. We find it difficult to believe that on a matter of such importance these warehousemen relied on the offhand reaction of a commissioner over the telephone rather than on their counsel's opinion.

Even if we could say that the warehousemen relied on the Burrows-Primmer conversation, the Department would be estopped only if the warehousemen had a

right to rely—that is, if their reliance was reasonable. *S & M Finance Co. v. Iowa State Tax Comm'n,* supra; 31 C.J.S. Estoppel § 71a at 432. We do not believe that in a matter of this significance, reliance by the warehousemen on what Burrows told Primmer in the telephone conversation would have been reasonable. Primmer himself testified Burrows explicitly said that any advice he gave was "unofficial." Primmer's notes stated, "No official Ruling for Tax Commission." Burrows was only one of three tax commissioners and could not speak for the Commission itself.

In addition, the *Lee Enterprises* case, which directly involved the interstate commerce issue under the services tax, was in the courts. Burns knew this. The *Lee Enterprises* litigation told the warehousemen that the Department asserted taxability. We hold that reliance by warehousemen on the telephone conversation would not have been reasonable.

We arrive at the same conclusion with respect to Burrows' alleged representations during the warehouse tour. The evidence here provides even less basis for estoppel. The record does not contain a shred of evidence that the warehousemen relied on anything Burrows said on the tour. On the contrary, plaintiff's executive secretary Burns was asked, "Were there any determinations [about the interstate question] that you recall made on that particular day in February 1968?" He responded, "There was nothing specific. We weren't asking for an answer right at that moment. We were trying to explain our situation and give them an idea so that they could answer and give us an answer." We find no testimony that Burns or any other warehousemen even remembered what Burrows said that day, let alone relied on it.

Here again reliance would not have been reasonable. Our comments on the Burrows-Primmer conversation apply here. The *Lee Enterprises* litigation told the warehousemen the Department's position regarding interstate commerce. In addi-

tion, in February 1968 Burrows was only deputy to Forst, who was director of the new Department. The warehousemen admit Forst did not tell them on the tour that storage of interstate goods was exempt.

We finally consider the representations allegedly made by Forst to Burns and warehouseman Dickinson in the meeting in February 1969. Here we have a clear-cut factual dispute. Dickinson testified Forst indicated in the meeting that interstate warehousing activities were not subject to the tax, that he said "I don't see any need for you at this time to go to the Legislature. I'm telling you this is what we are going to rule once this thing is out of Court."

Forst directly contradicted this testimony. The trial court believed Forst and found he made no representations that storage of interstate goods was exempt. The trial court's findings are entitled to consideration. Rule 344(f)(7), R.C.P.

We doubt Forst would indicate, after this court had just decided the Lee Enterprises case favorably to the Department, that he would ultimately rule storage of interstate goods was exempt. Forst stated that shortly after this court handed down its decision in that case he happened to see plaintiff's attorney and "just mentioned the fact that the *Lee Enterprises* decision resolved the question on the taxation of the services of warehouses on goods in interstate commerce it seemed to me." At another point in his deposition Forst testified, "I'm confident that the Supreme Court decision cleared up any question that any of this [sic] warehousemen may have had . . . ." Forst thus clearly felt in the spring of 1969 that the decision of this court in *Lee Enterprises* indicated the storage charges on interstate goods were taxable. The plaintiff's petition for certiorari in the *Lee Enterprises* case would make Forst even less likely to give the warehousemen an opinion of nontaxability. We find it difficult to conceive of his making such a statement at that time. In light of the trial court's fact finding and all the evidence including the circumstance of the *Lee Enterprises* case, we find Forst did not represent to the warehousemen that the storage of interstate goods was exempt.

■ Even if we assumed arguendo that tax officials made the representations which plaintiff asserts, we do not think plaintiff would be entitled to estoppel under the cases which plaintiff cites. This case differs from the ordinary tax estoppel case in an important respect. Ordinarily the plaintiff in such a case is one taxpayer, who shows he received information from a tax agency and acted on it. E. g. *La Societe Francaise De Bienfaisance Mutuelle v. California Employment Comm'n*, 56 Cal. App.2d 534, 133 P.2d 47. Here however the plaintiff is a statewide association of approximately 65 members. Plaintiff claims estoppel for *each* of those members. But we find no substantial evidence that plaintiff's representatives relayed the alleged representations to their individual members directly, or indirectly by sending their own opinions to the members, based on the alleged representations. Nor do we find evidence that the individual members then relied on such representations. On the contrary, the record does contain evidence that from the effective date of the tax in October 1967, plaintiff's leaders and members relied upon the opinion of their attorney that interstate warehousing was tax exempt; and the record does show *that* opinion was disseminated in writing to all the plaintiff's members in April 1968.

Specifically with reference to the 1969 meeting with Forst, we find no evidence that any advice on the interstate commerce issue was disseminated to plaintiff's members after such meeting. From the evidence we have, we can only conclude that plaintiff's members simply continued their reliance on their attorney's opinion and that any alleged representations by Forst had no effect on their conduct. Plaintiff has not proved reliance by its individual members upon Forst's alleged representations.

■ In oral argument plaintiff appeared to suggest that the Department should be

estopped because it did not *affirmatively* tell the warehousemen that storage of interstate goods was taxable. But the statute at its inception taxed warehousing and did not state an interstate commerce exception, and the Tax Commission's regulations, adopted at the inception of the services tax, likewise covered warehousing without an interstate commerce exception. Plaintiff cites no case, and we have found none, which holds that tax officials are estopped if they do not affirmatively tell the taxpayer his transactions are taxable under such circumstances.

Here again we have the fact that the Tax Commission and the Department had regulations providing the procedure—by letter or by application—to obtain a ruling. Director Briggs testified the Department's policy is only to rule on written requests "so we completely understand the question." Plaintiff did not choose to proceed under those regulations.

Finally, the California Supreme Court has said that while the state may be estopped in some tax matters, "the case must be clear and the injustice great." *United States Fidelity & Guaranty Co. v. State Board of Equalization*, 47 Cal.2d 384, 389, 303 P.2d 1034, 1037. The instant case, with its conflicting testimony and sketchy evidence of alleged oral advice, does not meet the test, nor does it meet the test applicable generally to estoppel cases. *Paveglio v. Firestone Tire & Rubber Co.*, 167 N.W.2d 636, 639 (Iowa) ("with strict proof of all the elements being demanded").

We conclude the trial court properly held that plaintiff is not entitled to application of the doctrine of estoppel.

II. *Wrapping, Packing, and Packaging.* Among other enumerated services, the tax applies to the services of "storage warehouse and storage locker," "warehouse," and "wrapping, packing, and packaging of merchandise other than processed meat, fish, fowl and vegetables." Code 1975, § 422.43. The statute also states exemptions, one of which is "gross receipts from the sales, furnishing or service of transportation service." § 422.45.

Plaintiff admits that when its members engage in wrapping, packing, and packaging merchandise other than processed meat, etc., the tax applies, and that the tax applies of course when its members store merchandise or non-merchandise, without more. On the other hand, the Department admits that wrapping, packing, packaging, and transporting non-merchandise, without more, is not taxable, and that the mere moving of goods is nontaxable. The parties' dispute relates to wrapping, packing, and packaging, and then moving and storing, non-merchandise.

Some of plaintiff's members, in addition to warehousing, engage in moving household goods. We will refer to those members as movers. Preparatory to a move, the movers wrap and pack the goods. Since the goods are not merchandise, the tax ordinarily would not apply to the wrapping and packing. On some occasions, however, the mover stores the goods in his warehouse before transporting them to their destination, for example, when he consolidates loads or when the owner is not ready to receive the goods at destination. The Department asserts that when such storage occurs, the charge for wrapping and packing the goods automatically becomes taxable. Plaintiff claims this is wrong.

In construing a tax statute, we resolve doubts in favor of the taxpayer. *Iowa National Industrial Loan Co. v. Iowa State Dep't of Revenue*, 224 N.W.2d 437, 440 (Iowa). We find taxability only if it appears to be clearly intended from the language of the statute. *In re Estate of Dieleman v. Department of Revenue*, 222 N.W.2d 459, 461 (Iowa). On the other hand, "[E]xemption statutes must be strictly construed and any doubts must be resolved against the exemption and in favor of taxation. The burden is on the one claiming the exemption to clearly show his right thereto." *American College Testing Program, Inc. v. Forst*, 182 N.W.2d 826, 827 (Iowa).

See also *Aerie 1287, Fraternal Order of Eagles v. Holland*, 226 N.W.2d 22, 24 (Iowa).

The Department relies upon the definition of "services" found in § 422.42(13), Code 1975: "*all* acts or services rendered, furnished, or performed . . . for a valuable consideration by any person engaged in any business or occupation specifically enumerated in this division . . . ." (Italics added.) The Department argues that since warehousing is a specifically enumerated service and since a mover who also stores the goods is engaged in warehousing, all services rendered by him with respect to the goods, including wrapping and packing, are automatically taxable. The trial court held for the Department.

We cannot go as far as the Department argues. The next section, § 422.43, goes on to provide, "The following *enumerated* services shall be subject to the tax herein imposed on gross taxable services: . . ." (Italics added.) Then follows an enumeration of services including warehousing. We think the legislature did not intend to make *all* activities of a person automatically taxable merely because *some* of his activities are taxable. We believe the correct rule to be that the tax applies only to the enumerated services. The questions in a given case are, what activities does an enumerated service encompass, and what service is involved in the particular situation?

As to the first of these questions, the service of transportation of household goods undoubtedly encompasses wrapping and packing the goods; transporting unpacked household goods would be impractical if not unfeasible. But the service of storage of household goods also undoubtedly encompasses wrapping and packing. A warehouseman could not practicably store unpacked pots and pans, furniture, bedding, and articles of clothing.

As to the second question—whether the service involved in a particular situation is transportation or storage—the answer would appear to turn on the predominant service involved in the situation.

Thus an individual may be assigned to a two-year tour of duty abroad. He may have a mover pack his household goods and place them in the mover's warehouse, to be kept there for the two-year period. The individual may intend to have the mover transport the household goods at the end of the period to a different house which the individual owns. We could not fault the Department for ruling here that storage is the predominant service, so that the packing is taxable.

On the other hand, the individual may be transferred from one city to another in this country. He may have a partial truckload of household goods, which the mover packs. The mover may take the goods to his warehouse to be placed with another partial load headed in the same direction. The mover may leave the goods in the warehouse overnight or even for several days, awaiting the rest of the load. We think the predominant service here is so clearly moving that the Department could not reasonably rule the packing to be taxable.

Between these extremes cases will arise in which the Department will have to determine from the situation whether the predominant service is moving or storage. Since the legislature has seen fit to place the administration of this law in the hands of the Department, the Department's decision in given situations will control unless within § 17A.19(8)(g), Code 1975. See also § 422.55(1).

■ We thus overturn the portion of the trial court's judgment upholding the Department's position that storage of household goods transported by a mover automatically renders the wrapping, packing, and packaging of the goods taxable.

III. *Standing.* The third issue, somewhat independent of the first two, stems from plaintiff's attack upon the validity of the application of § 422.33 of the Code to foreign corporations which deliver goods from points in Iowa to customers in Iowa.

Section 422.33 imposes an income tax on corporations. Section 422.33(1) provides in relevant part:

1. If the trade or business of the corporation is carried on entirely within the state, the tax shall be imposed on the entire net income, but if such trade or business is carried on partly within and partly without the state, the tax shall be imposed only on the portion of the net income reasonably attributable to the trade or business within the state, said net income attributable to the state to be determined as follows:

(a) [Allocation of the class of income consisting of interest, dividends, rents, and royalties.]

(b) Net income of the above class having been separately allocated and deducted as above provided, the remainder of the net income of the taxpayer shall be allocated and apportioned as follows:

[Income from other than manufacture or sale of tangible personal property.]

Where income is derived from the manufacture or sale of tangible personal property, the part thereof attributable to business within the state shall be in that proportion which the gross sales made within the state bear to the total gross sales.

The gross sales of the corporation within the state shall be taken to be the gross sales from goods delivered within the state, excluding deliveries for transportation out of the state.

Since 1959, a federal statute has prohibited any state from imposing on a foreign corporation a net income tax on income derived within the state from interstate commerce if the corporation's only business activity within the state is the solicitation of orders for sale of tangible personalty, if the orders are sent out of state for approval, and if the approved orders are filled *by shipment from a point outside the state.* 15 U.S.C.A. § 381.

Prior to 1971, gross sales "within the state" were defined by § 422.33(1)(b) of the Iowa Code as "gross sales from goods *sold and* delivered within the state . . . ." (Italics added.) An amendment effective January 1, 1971, deleted the italicized words. 64 G.A., ch. 165, § 37. Thus since that date a foreign corporation has been taxed on income from the sale of goods delivered in Iowa from a point in Iowa even though the sale was effected outside the state. As a result, if a foreign corporation solicits orders in Davenport, Iowa, but approves the orders and stores the merchandise in Moline, Illinois, and makes delivery from Moline to Davenport, the sales are not allocated to Iowa for Iowa income tax purposes. But if the corporation stores the merchandise in Davenport and makes delivery from that point to the Davenport customer, the sales are allocated to Iowa. Plaintiff's evidence indicates that because of the latter allocation, some foreign corporations have taken their goods out of Iowa warehouses and stored them in nearby states. This of course decreases the business of plaintiff's members.

Plaintiff attacks the validity of § 422.-33(1)(b) insofar as it taxes foreign corporations whose only contacts with Iowa are solicitation of sales in Iowa and storage of goods in Iowa warehouses. Plaintiff claimed on trial that § 422.33(1)(b) is invalid because it is contrary to the equal protection clause of the United States Constitution, it creates an undue burden on interstate commerce in violation of the Commerce Clause in § 8 of Article I of the Constitution, it is "arbitrary and unreasonable," and it violates the federal statute we have cited. The trial court did not reach the merits of plaintiff's claim, holding that plaintiff did not have standing to attack § 422.33(1)(b) because neither plaintiff nor any of its members is a foreign corporation taxed by that section.

In arguing that it has standing, plaintiff relies primarily upon federal cases. Since plaintiff's claims are based upon the United States Constitution and a federal statute,

we look to the federal cases for enlightenment on standing.

Plaintiff stresses that its members have suffered substantial economic losses because of § 422.33(1)(b) and relies upon such cases as *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (the gist of standing is a "personal stake in the outcome"). Plaintiff argues, reasonably, that its members have a stake in overturning § 422.33(1)(b)—they have suffered "injury in fact" because of the statute.

But plaintiff overlooks the decisions which hold that a party who has suffered injury in fact usually may not assert the rights of third persons—jus tertii. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 355; *McGowan v. Maryland*, 366 U.S. 420, 429, 81 S.Ct. 1101, 1107, 6 L.Ed.2d 393, 401; *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586, 1594.

Plaintiff does assert the rights of third persons here—the foreign corporations taxed under § 422.33(1)(b). Plaintiff claims that *those corporations* are denied equal protection of law. In contending that § 422.33(1)(b) is an unconstitutional burden upon interstate commerce, plaintiff advances the right of *the foreign corporations* to engage in such commerce. In its attack on § 422.33(1)(b) as "arbitrary and unreasonable," plaintiff apparently means that the statute deprives *the foreign corporations* of due process. And in relying upon the federal statute, plaintiff asserts the interests of *the foreign corporations* which that statute attempts to protect from burdensome taxation.

The general rule against raising jus tertii thus applies in full force here. The courts have however developed several exceptions to that rule. Do any of the exceptions apply to this situation?

Some cases allow a party to raise a third person's rights where a peculiar relationship between the party and the rightholder makes such allowance appropriate. Thus

the United States Supreme Court held a person charged with being an accessory to the illegal use of contraceptives to have standing to raise the rights of the persons to whom he had allegedly acted as an accessory. *Griswold v. Connecticut*, 381 U.S. 479, 481, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510, 513. The Court also held that a society engaged in private education of children had standing, on the basis of the rights of the parents and guardians of the children, to attack a statute requiring all children to attend public schools. *Pierce v. Society of Sisters*, 268 U.S. 510, 534–536, 45 S.Ct. 571, 573–574, 69 L.Ed. 1070, 1078. The Court may have based standing in that case on the close teacher-student relationship. Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599, 642. The relationship in the present case between the warehousemen and the foreign corporations is an ordinary commercial one. Such a relationship has not usually been held sufficient to allow a party to champion third persons' rights. Id. at 638.

The Court has developed another exception, where the rightholder has difficulty asserting his own rights. *Eisenstadt v. Baird*, 405 U.S. 438, 446, 92 S.Ct. 1029, 1034, 31 L.Ed.2d 349, 358; *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386, 393; *Barrows v. Jackson*, supra, 346 U.S. at 257, 73 S.Ct. at 1035, 97 L.Ed. at 1596; Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L. Rev. 423, 425 (1974). But the evidence here contains no indication that foreign corporations are unable to attack the validity of § 422.33(1)(b) if they wish.

The Court has made a third exception where, unless assertion of the third person's rights were permitted, those rights would be diluted and adversely affected. *Eisenstadt v. Baird*, supra, 405 U.S. at 446, 92 S.Ct. at 1034, 31 L.Ed.2d at 358; *Griswold v. Connecticut*, supra, 381 U.S. at 481, 85 S.Ct. at 1680, 14 L.Ed.2d at 513; *N.A.A.C.P. v. Alabama ex rel. Patterson*, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488, 1498; Note, 88 Harv.L.Rev., supra, at 425.

In the present situation, the rights of foreign corporations will not be diluted or adversely affected if plaintiff is not allowed to raise them.

This case therefore falls within the rule developed by the federal cases prohibiting a party to a suit from raising the rights of others. Plaintiff's problem is that the tax falls on entities which are not parties to this action.

Our own decisions lead to the same conclusion. This court has held in a number of cases that only a member of the class subjected to discrimination may raise an equal protection claim. *Green v. Shama*, 217 N.W.2d 547, 556 (Iowa); *Mid-America Pipeline Co. v. Iowa State Commerce Comm'n*, 255 Iowa 1304, 1309, 125 N.W.2d 801, 804; *Browneller v. Natural Gas Pipeline Co.*, 233 Iowa 686, 692, 8 N.W.2d 474, 477; *Iowa Life Ins. Co. v. Board of Supervisors of Black Hawk County*, 190 Iowa 777, 782, 180 N.W. 721, 723. See also 16 Am.Jur.2d Constitutional Law § 123 at 319; 16 C.J.S. Constitutional Law § 88 at 260.

One case in Iowa involved a claim by the plaintiff that a statute outlawing studded snow tires unreasonably interfered with interstate commerce. This court held the plaintiff lacked standing to raise the claim because he did not show that he himself was engaged in such commerce. *Kruck v. Needles*, 259 Iowa 470, 479, 144 N.W.2d 296, 302.

The trial court held correctly that plaintiff lacks standing to attack § 422.33(1)(b).

Appeal costs are taxed two-thirds to plaintiff and one-third to the Iowa Department of Revenue.

Affirmed in part, reversed in part.

All Justices concur except MOORE, C. J., and REYNOLDSON, RAWLINGS and HARRIS, JJ., who dissent.

REYNOLDSON, Justice (dissenting).

In our *de novo* review I have concluded the record does not support the factual findings in division I of the majority opinion. I therefore respectfully dissent from that division only.

. The significant conduct of the people who populate this record must be viewed against the backdrop of voluminous legislation approved July 1967. 62 G.A., chapters 342 and 348. Among other changes, these enactments extinguished the state tax commission effective January 1, 1968, substituted a department of revenue, and raised sales and use taxes from two to three percent. A three percent tax was imposed on gross receipts from 59 enumerated services (§ 422.43, The Code, 1971) which the "retailers", as in sales of tangible property, were forbidden to absorb (§ 422.49, The Code, 1971) and were required to extract from the service consumer (§ 422.48, The Code, 1971).

The service tax was effective October 1, 1967. 62 G.A., ch. 348, § 35. The state tax commission was charged with administration of the act. Commission chairman Earl A. Burrows, Jr., testified, "we had a relatively short time in which to get information out for the administration of the collection of the taxes, so we would make talks and also invite members of associations or interested people, businessmen or others in to discuss with us the various facets of the law and get their ideas and also get ours. * * * [T]rying to promulgate rules and regulations was very difficult * * * it was my understanding that we would stay away from the taxability of areas in which interstate commerce would come up." The rules hastily promulgated September 30, 1967, the day before the tax became operational, were, in the main, merely a repetition of the statute and a loose definition of the respective services affected.

Plaintiff's members, many of whom provided temporary warehousing of property moving in their interstate transportation business, logically questioned whether under the Commerce Clause, United States Constitution, they were required to charge tax on this part of their business. There had always been an exemption in the sales tax law for "service of transportation serv-

ice," § 422.45(2), The Code, 1966; and for sales of tangible personal property "which this state is prohibited from taxing under the constitution or laws of the United States * * *." Section 422.45(1), The Code, 1966. The new legislation amended the latter provision by adding, following the word "property", the words "services rendered, furnished or performed." 62 G.A., ch. 348, § 22(1).

Language in a number of federal decisions would have encouraged questions from the new involuntary tax collectors. *Helson v. Kentucky*, 279 U.S. 245, 252, 49 S.Ct. 279, 281, 73 L.Ed. 683, 687 (1929) ("tax which falls directly upon the use of one of the means by which commerce is carried on directly burdens that commerce"); *Puget Sound Stevedoring Co. v. Tax Commission*, 302 U.S. 90, 94, 58 S.Ct. 72, 74, 82 L.Ed. 68, 72 (1937) ("The business of loading and unloading being interstate or foreign commerce, the state of Washington is not at liberty to tax the privilege of doing it by exacting in return therefor a percentage of the gross receipts"); *Federal Compress & W. Co. v. McLean*, 291 U.S. 17, 22, 54 S.Ct. 267, 269, 78 L.Ed. 622, 627 (1934) ("Here the privilege taxed [operating a warehouse] is exercised before interstate commerce begins, hence the burden of the tax upon the commerce is too indirect and remote to transgress constitutional limitations").

The regulations promulgated by the tax commission totally avoided the above issue. Eminent legislators told members of the plaintiff association it was the legislature's intent to exempt interstate commerce. It was only natural that Ernest Primmer and others in like position, on the firing line and charged with collecting the tax, should contact the commission. Nor do I understand the department to be asserting here that neither it nor the prior commission had a duty to advise these collectors. Rather it seems to be arguing it had no obligation unless the request was in writing and in any event it could not be estopped by oral advice of its agents. I will touch on these points, infra, but note here the department

has never challenged state tax commissioner Burrows' statement the tax commission had the assigned duty "to help taxpayers know what is to be taxed and what is not."

So Mr. Primmer on October 3, 1967 called the commission and asked for the "top man". After chairman Burrows was placed on the line Primmer told him "we were in the period now * * * that we were his * * * unpaid tax collector, but we were going to do the job for him as required by law but we needed some guidance * *." Primmer detailed the warehouse tax problem his moving and storage company encountered because merchandise was sent to his company from out of state suppliers, unloaded in its warehouse, then loaded on company trucks to complete delivery to the ultimate consignee. Burrows replied, "If it came across the state line coming into your warehouse, it is involved in interstate commerce and that is exempt."

Primmer then detailed the warehouse tax problem created by Maytag, which shipped its product to his company's Davenport warehouse for delivery into both Illinois and Iowa. At that point Burrows put "our attorney" on the telephone who suggested the tax be charged on warehouse services for merchandise which stayed in Iowa, but not on that delivered into Illinois.

Burrows testified it was "very possible" Primmer could have made the telephone call; that the commission was receiving many calls and "we would try to give guidelines for the collector of the tax." He testified it was his position there would be no warehouse tax collected on goods coming into Iowa or going out of Iowa and on this point among the three commission members "I probably had a majority opinion, if not everybody's." Burrows further testified, "we were going to apply the tax to that part of the charges that were attributable to goods that would stay in Iowa."

Thus regardless of an uncertainty concerning the identity of the commission attorney who participated in the Primmer conversation, the opinions Primmer said he

received were those held at that time by the state tax commission. The record establishes on a later Des Moines warehouse tour, conducted by representatives of plaintiff organization for Burrows and other commission personnel, Burrows further confirmed his position there should be no tax charged for warehousing merchandise moving in interstate commerce and he then expressed the same advice.

During this time plaintiff organization had only 55 to 65 members and little money. The executive secretary, Frank R. Burns, received $15 per month. An oral "pipeline" for the exchange of information about the new legislation had been established among members of the association through its executive secretary. Primmer testified he fed the pipeline "in reverse", relaying the information he received from the commission to Burns, who confirmed the information "pretty well dovetailed" with "what had been given *to* an attorney for the *Iowa Motor Truck Association.*" (Emphasis supplied.) There is a clear inference to be drawn from the record that the substance of the Primmer telephone consultation, fed back into what he termed the "pipeline", reached the members of plaintiff association.

January 1, 1968, the state tax commission went out of existence. The department of revenue stood in its place and William H. Forst had just arrived in Iowa to be its director. Burrows remained as deputy to the director. Members of plaintiff organization had not yet received any written guidelines, rules or regulations relating to the impact of the commerce clause on their tax collection duties. They were confronted with a new "top man".

Another tour of Des Moines warehouses was conducted by plaintiff for director Forst. Several persons from the industry were present, including executive secretary Burns of Blue Line Storage and Dave Little of Merchants Transfer and Storage. The department of revenue was represented by director Forst, Everett A. Sheldahl, director of the department's sales and use tax division, Donald E. Cunningham, assistant sales tax director, and probably others whose identity in the record is uncertain.

Forst testified the warehousemen "were concerned about the many different kinds of services that they provided and which of these services would be taxed and which might be exempt", they were "definitely looking for advice and direction as to what they should do." Several times in his testimony Forst stated he could not recall giving them any ruling. He did volunteer "I may have made a statement that these goods are obviously in interstate consignment * * * but I don't recall making any positive statement on the levy * * *." On several occasions he carefully limited his response, relying on the department's failure to issue a "formal ruling", which he defined as a written ruling. He finally ventured, "Well, to my knowledge, I cannot recall any or all positions taken in relation to tangible personal property moving in interstate commerce and services performed on that property."

Assistant sales tax director Cunningham agreed the warehousemen obtained little information from Forst on this tour. He testified they reported they were not collecting anything except "what was purely intrastate or local warehouse." They "wanted some guidance." Cunningham viewed with some awe that Forst "didn't give a direct answer on anything. * * * I admired * * * his kind of defense." He quoted Forst as saying "We will give you something," because "they needed some finalities somewhere along the line."

Sales and use tax division director Sheldahl also conceded the warehousemen on the Forst tour wanted a determination of which services they had to "collect and pay taxes on." While he could not recall Forst's exact words, he got the impression "as long as it came in interstate and was labeled to go out interstate and continued on in interstate * * * [it] would be exempt from the tax." The apparent inconsistency between the Cunningham and Sheldahl testi-

mony may be explained by the fact the group was not together at all times during the tour.

The majority concludes the only warehouse inspection Burrows took was the Forst tour in February of 1968. Burrows testified he toured one warehouse in 1967 and Mr. Forst took a subsequent tour. Forst testified to a single tour of two warehouses in February 1968. As above noted, Cunningham and Sheldahl from the department were along. Sheldahl and Cunningham separately denied any recollection of Burrows accompanying them. Forst testified " * * * Al Burrows may have been on the trip with us. That is quite possible, but again I can't resurrect anything that would speak directly to that." The only person present who placed Burrows on the Forst tour was plaintiff's executive secretary Burns. Immediately after so stating he gave the following testimony:

"Q. Was Mr. Cunningham on the tour? A. Yes. There was some that met us at the luncheon. Now it is a possibility that maybe this is where I became confused, because we had lunch with these people afterwards."

The inference is that Burrows may have met the group for lunch, although he did not repeat his warehouse visit. Majority's conclusion there was only one tour which was made by both Burrows and Forst is against the great weight of the evidence.

When director Forst did not comply with his promise to "give you something," Burns and Darrell Dickinson, vice president of Mid-America Lines Public Warehouses Household Goods Division of Kansas City, Missouri and a member of the plaintiff's board of directors, paid him an office call. Burns places the time in March or April of 1969, Dickinson in late 1968 or early 1969. Both testified Sheldahl was present. Burns testified they explained to Forst again exactly how they were handling the tax, and further,

"Well, our primary purpose—As you know, we had not received a written or-der in regard to the interpretation of this thing * * * so we went to him again and asked if an order could be given, and he was not in a position at that time, because of the lawsuits involved, to issue an order. We asked him at that time point blank whether he thought we should go to the Legislature and possibly tie onto one of the bills that were being proposed at that time. His answer to us was that we had no problem and there would be no reason for us to spend our money."

As a result of that meeting, plaintiff organization did not pursue any legislation.

Dickinson's recollection of the meeting was fully as specific. Forst could not recollect this meeting or anything about it. While it seemed to him there were two meetings, he testified, "Well, quite possibly if there had been a second meeting we would have had it here because we would have already been to the field to look at it. But I can't recall a second meeting, nor can I find any evidence of a second meeting." The department never produced its division director Sheldahl to refute the testimony of Burns and Dickinson, although both placed him at the conference. Nor was Sheldahl's attention ever directed to this meeting Dickinson and Burns testified about at trial. Sheldahl's only testimony was on plaintiff's pre-trial discovery deposition. At the most he only gave a negative response to the question, "Did *you* have any other *discussions* with any group of warehousemen other than the one you described in February of 1968?" (Emphasis supplied.) Of course, the evidence discloses he was only an observer and did not participate in the discussion with Dickinson and Burns.

The majority not only overlooks the department's failure to produce Sheldahl's testimony about this meeting, it refuses to give any weight to the testimony of Burns and Dickinson regarding Forst's statements at this second meeting because "Forst directly contradicted this testimony." I find no direct contradicting testimony in the

record. As in the case of Sheldahl, Forst's attention was never directed to the testimony of Burns and Dickinson in this regard. While some of his statements inferentially contradict their testimony, other statements are evasive.

The majority's second reason for discounting the Burns-Dickinson testimony is that this court had filed the *Lee Enterprises* decision and there was no longer any reason for Forst to delay a written guideline. But the *Lee Enterprises* case was still in litigation and on its way to the United States Supreme Court. Our opinion was filed November 12, 1968. December 26, 1968, when the petition for rehearing was pending here, plaintiffs filed application for stay of procedendo upon· any final decision adverse to them until final determination by the United States Supreme Court. Following a ruling adverse to the *Lee Enterprises* plaintiffs on their petition for rehearing, we entered an order staying procedendo and continuing the lower court injunction against collecting the tax from plaintiffs upon their posting a $100,000 bond, which was filed. June 4, 1969, the service tax on advertising was repealed. 63 G.A., ch. 248. June 12, 1969, the appeal to the United States Supreme Court was dismissed on appellant's motion. Without question, at the time of the Burns-Dickinson-Forst-Sheldahl meeting, the department was still very much involved in the *Lee Enterprises* litigation.

Thus the two reasons majority assigns for disbelieving the clear, explicit and detailed testimony of Burns and Dickinson concerning Forst's representations are not supported by the facts.

Although the department knew the warehousemen were collecting tax only on storage of property moving in intrastate commerce, no mass audits were made until after the *Lee Enterprises* appeal was dismissed. In a classic Freudian slip, Forst testified that in the department there was "discussion after the *Lee Enterprises* case that we needed to revise our—not revise our position, but to enforce the rule." At another

time, he said, "I do recall only saying with Mr. Briggs prior to leaving—and that would have been in late 1969—that the audits in the warehousing area, you know, we had to do because we had to address ourselves to that policy that we had never issued any rule on."

The warehouse audits got underway in 1971 after Briggs became the department director. He had not been a party to the prior advice given the warehousemen. Apparently the "rules" quoted by the majority were insufficient even for the field auditors. According to Sheldahl, they had questions and needed "guidelines". The response was not adoption of rules or regulations but the communication (Sales and Use Tax Bulletin) to the field staff dated January 28, 1972. More than four years after the service tax went into effect, the department finally stated in writing its position on seven different warehousing services or situations, declaring some taxable and some exempt.

A close analysis of Forst's deposition demonstrates, contrary to department's argument, that he never told the warehousemen that if they did not collect the tax on storage of interstate goods, they proceeded at their own risk. Forst said that was the position he took with the advertising people. On cross-examination he was asked point-blank, "Did you tell that to the warehousemen?" to which he responded, "Well, I don't know that I told that to the warehousemen. * * * I do not recall telling them that. That is the only area [warehousing] that I can see that I would have said something that sounded as positive as what they are saying that I said."

Overall, Forst's testimony was evasive and inconsistent. He continually hedged by stating the department issued no "*formal ruling*". The implication is plain he did not consider anything he or any other employee said to be binding unless it was reduced to writing. Although conceding the warehousemen may have orally requested a formal ruling he maintained if they had only made a written request for a formal ruling

it would have been given. But on three occasions in his testimony, he maintained the department would not take any position because the constitutionality of the levy was before the supreme court.

There is no shred of evidence in this record the warehousemen were ever told they should submit a written request for ruling, or that a "formal" ruling only awaited such demand. What does come through from all the evidence is the clear impression they received oral but no written guidelines from the commission in 1967 because of the chaotic state of that body and its employees following the massive legislation. After the *Lee Enterprises* case was instituted (December 12, 1967) the department was reluctant to reduce to writing what it was telling the warehousemen for fear the litigation might be adversely affected.

Burns testified because plaintiff organization had no funds an ad hoc committee prevailed upon the Motor Truck Association to lend assistance of its lawyer in attempting to "find out what their [commission] thinking would be in regard to our storage portions of our business that were in interstate commerce." This prevailed until "we received a final notice from [the attorney] through the Motor Truck Association in the spring of '68." The reference is apparently to a communication in March or April of 1968 from the attorney to the *truck association*, dealing incidentally with service tax on storage and setting out the same guidance Burrows gave the warehousemen.

The majority asserts plaintiff association's members relied on this information from the attorney, not the advice of Burrows and Forst. This is belied by the fact the warehousemen from the beginning collected tax only on storage of goods moving intrastate, six months prior to the lawyer's communication. This was in direct conformance with the opinion then held by the majority of the commission. It goes against all reason to assert that opinion was not communicated to the warehousemen. Neither is there any evidence the plaintiff hired an attorney to obtain a "formal" rul-

ing, or that he was employed by plaintiff at the time Forst claims to have made the alleged statement to the attorney relating to warehousing service tax following the *Lee Enterprises* case.

The record is plain that Burrows, a department lawyer, and Forst all made oral representations to the warehousemen upon which they reasonably relied. But taking the worst possible view of the evidence from plaintiff's standpoint, then it must be conceded that although repeatedly pressed for guidelines the department played a cat-and-mouse game with the warehousemen, in which they were forced to either collect and remit the tax at the peril of a class action by consumers if they were wrong, or not collect it and pay it themselves upon assessment and levy by the commission if that course of action proved to be in error. Nor am I persuaded by defense counsel's suggestion in oral argument the plaintiff could have sued the department to obtain written guidelines. Those whom the state placed on the cutting edge of tax collection ought to have been furnished guidelines and I am convinced in this instance they were, albeit in the form of oral advice.

In 1958 when Professor Davis published his "Administrative Law Treatise" he stated, § 17.06, p. 519:

"What the law of estoppel of governmental units most needs is a larger measure of judicial freedom from the rigidity of the oft-repeated statements that a state or local government cannot be estopped. Equity courts should restore their own power to determine whether or not in any particular circumstances justice requires resort to the doctrine of equitable estoppel. The fortunate fact is that a good many recent holdings do apply that doctrine to governmental units."

A large number of decisions supporting the last quoted sentence are cited and discussed at pages 520–525.

By date of publication of this "Administrative Law Treatise 1970 Supplement" Professor Davis could say, § 17.09, p. 607:

"The movement toward allowing estoppel of governmental units continues. Federal courts often allow the government or its officers to be estopped, and the highest courts of New York, Illinois and California hold municipalities to be estopped."

Among the more recent cases cited and discussed in K. Davis, Administrative Law Treatise, 1970 Supplement § 17.03, pp. 588–591, § 17.06, pp. 594–597 are: *United States v. Fox Lake State Bank*, 366 F.2d 962, 965–966 (7 Cir. 1966) (government held estopped to bring action under Civil False Claims Act against a bank); *Schuster v. Commissioner*, 312 F.2d 311 (9 Cir. 1962) (Commissioner of Internal Revenue held estopped to impose tax liability on trustee bank where Commissioner audited, determined trust not taxable, which determination was relayed to the bank by the beneficiary which then delivered corpus to beneficiary); *Simmons v. United States*, 308 F.2d 938, 945 (5 Cir. 1962) (holding government may be estopped in a tax case by unpublished advice by a local tax official); *Rand v. Andreatta*, 60 Cal.2d 846, 36 Cal.Rptr. 846, 389 P.2d 382 (1964) (estoppel may be used in a proper case to excuse the late filing of claims against public entities or the filing of such claims in a defective form); *Trustees of Internal Improvement Fund v. Lobean*, 127 So.2d 98 (Fla.1961) (estoppel by deed operates against State of Florida); *Johnson v. Oregon State Tax Commission*, 248 Or. 460, 435 P.2d 302 (1967) (county assessor estopped from assessing because he had misled the taxpayer).

The majority concedes *S & M Finance Co. Fort Dodge v. Iowa State Tax Comm'n*, 162 N.W.2d 505 (Iowa 1968) left open the question whether equitable estoppel in a proper case would be applied against the state where, as here, the persons to whom the representations were made were essentially tax collectors for the state. Although in a five-to-four decision we refused to apply the doctrine in *S & M Finance Co.*, the facts make that case clearly inapposite. There the taxpayer obtained preliminary advice from a field agent. The record neither disclosed the "nature of his work nor the extent of his authority." *Id.* at 511. Here the warehousemen went directly to the "top man". There the erroneous oral advice was promptly corrected by a written communication. Here the oral advice was corrected four years later. Nothing in *S & M Finance Co.* prevents us from providing plaintiff relief in this case.

Many of the older estoppel decisions from other jurisdictions articulating hard-bitten rules in the state's favor, must be cautiously viewed in light of a modern movement recognizing the state's responsibility for its agents' acts in course of their employment. This duty was extended to torts by the Iowa legislature in 1965. 61 G.A., ch. 79. It was extended to contracts by this court in 1973. *Kersten Co., Inc. v. Department of Social Services*, 207 N.W.2d 117 (Iowa 1973). These enlightened concepts are restless in the company of department's theory these unpaid tax collectors had no right to rely on advice offered by the head of the state's tax collection agency.

On October 7, 1971, there was a meeting between Director Briggs and Darrell Dickinson, Ernest Primmer, and others of the association's leadership. According to Dickinson, "We went down what we termed to be at that time the Forst ruling, and Mr. Briggs was very emphatic that he had a total[ly] different concept of what was interstate commerce and that what we were telling him was just null and void, that it had no bearing on it since we had no formal rulings." The association was then relying on oral representations from two prior heads of the tax collection agency. Upon receiving this advice from the new "top man" they could no longer reasonably rely on the prior advice.

I would hold the department estopped from requiring the association's members to pay the tax they were advised not to collect on charges for warehousing property moving in interstate transit from October 1,

1967 to October 7, 1971. Of course, following the May 8, 1969 amendment, storage in Iowa of goods destined out of state would be exempt in any event. 63 G.A., ch. 247, § 2.

MOORE, C. J., and RAWLINGS and HARRIS, JJ., join in this dissent.